**SIDA OF HAWAII, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 73–2817.

United States Court of Appeals, Ninth Circuit.

Feb. 24, 1975.

Richard F. Liebman (argued), Honolulu, Hawaii, for petitioner.

Allen H. Feldman, N. L. R. B. (argued), Washington, D. C., for respondent.

Before KILKENNY and SNEED, Circuit Judges, and GRAY,* District Judge.

WILLIAM P. GRAY, District Judge:

SIDA of Hawaii, Inc. petitions for review of a decision and order of the National Labor Relations Board (the Board) requiring it to recognize and bargain with the certified representative of its "members," whom the Board found to be "employees" within the meaning of § 2(3) of the National Labor Relations Act (the Act), 29 U.S.C. § 152(3) (1964). The Board makes cross-application for enforcement of its order. SIDA's petition is based upon its contention that its members are independent contractors rather than employees. We agree with SIDA and accordingly deny enforcement of the Board's order.

## I. THE ORGANIZATION AND FUNCTIONS OF SIDA

SIDA styles itself as a self-governing "trade association" formed by independent taxicab owner-operators with the intent of preserving their independence while simultaneously providing a collective body able to compete with the larger taxi companies in bidding for the right to operate out of the Honolulu airport. SIDA insists that it was conceived strictly for the benefit of its drivers and that stock ownership is widespread among, and limited to, drivers, former drivers or their heirs.

SIDA maintains a skeleton corporate structure headed by a seven-person, non-salaried Board of Directors, all of whom must be drivers. An Operations Committee composed of six drivers acts upon complaints from drivers and the general public and has the authority to suspend or terminate drivers found to have violated the Association's regulations. The only salaried employees are a general manager who performs general administrative duties from his airport office, radio dispatchers who relay customer calls to the drivers, and line operators who regulate and maintain order in the cab queues at the airport.

Presumably, SIDA's principal reason for existence is its contract with the State of Hawaii, under which it has the exclusive right to provide metered taxi service at the Honolulu International Airport. Other SIDA activities beyond the airport contract include: (1) the maintenance of contracts with several other commercial entities; (2) the provision of radio dispatchers, a service financed from a monthly stall rental fee paid by the drivers; (3) the selling of gasoline to the drivers at reduced rates; (4) the furnishing of business cards bearing SIDA's seal, name, address and phone number, the cost of such cards being covered by the stall rental fee; (5) the purchase of advertisements in the Yellow Pages; and (6) the promulgation of rules and regulations which drivers must abide by and which are enforced by the above-mentioned Operations Committee.

Membership in SIDA is available on an equal basis to any qualified applicant, subject to approval by the general mana-

---

* Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation.

ger. Such approval is based upon ownership of a suitable vehicle, a valid operator's license, and a personal appearance acceptable to the general manager. Upon such approval, an applicant becomes a member of SIDA by executing the Standard Independent Drivers Contract, the provisions of which are unilaterally established by the Board of Directors.

## II. EMPLOYEE OR INDEPENDENT CONTRACTOR

■ Section 2(3) of the Act specifically provides that "[t]he term 'employee' . . . shall not include . . . any individual having the status of an independent contractor . . . ." It is well-established doctrine that determinations of whether an individual is an employee or an independent contractor are to be made by the application of common law agency principles to the total factual context of each case. NLRB v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). Brown v. NLRB, 462 F.2d 699, 702 (9th Cir. 1972).

■ The application of agency principles to the facts is a proper subject for judicial review, but our review of the Board's action is limited. This court recognizes that it may not displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We conclude here, however, that the Board's determination that the SIDA owner-operators are employees is a decision lacking substantial support in the record considered as a whole. As this court reaffirmed in *Brown*, we cannot uphold the Board where it has in its "application of the law to the facts overlooked accepted principles of the law of agency . . . ." 462 F.2d at 702, quoting Carnation Co. v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970).

The essential ingredient of the agency test is the extent of control exercised by the "employer". It "rests primarily upon the amount of supervision that the putative employer has a right to exercise over the individual, particularly regarding the details of the work". Associated Independent Owner-Operators, Inc. v. NLRB, 407 F.2d 1383, 1385 (9th Cir. 1969). We noted in *Brown, supra,* that it is immaterial that a putative employer wishes to promote sales and adjust complaints, as such things are mutual goals common to employee and independent contractor relationships; on the other hand, "the means used and the respective controls in accomplishing these goals are . . . highly material to the determination of employee or contractor status." 462 F.2d at 703.

As the authors of the Restatement of Agency 2d have written, the "important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants." Restatement of Agency 2d § 220, Comment e at 487–88.

■ In light of the above-mentioned general agency principles, we find that the following factors clearly establish the relative absence of actual control by SIDA, as an entity, and point up the independent contractor status of the drivers:

(1) The drivers make substantial personal investments in their taxicab activities. They purchase and maintain their own vehicles; obtain all necessary city and state permits; pay for their own health insurance, Social Security, unemployment benefits, and income taxes; maintain their own automobile insurance; and pay a monthly stall rental fee to SIDA in addition to a $0.50 trip fee for each trip out of the airport.

(2) The drivers are substantially independent in their operations. They are generally free to work or not work for SIDA when they choose; they may "moonlight" by working for other cab companies; they are free to make their

**358**

own arrangements with clients and to develop their own goodwill; they are not limited to any particular area of operation (with the exception of three drivers who operate out of one shopping center); fares are determined not by SIDA, but by local meter ordinances and are collected and retained by the drivers; SIDA supervision is greatest at the airport, but is there limited to line operators charged only with maintaining order in the cab queues—otherwise, SIDA's only tangible connection with the drivers is by radio; SIDA pays no compensation to the drivers, makes no withholding, Social Security, or unemployment insurance deductions on their behalf, and keeps no income records for them.

(3) The driver's contract specifically provides that the relationship created is one of independent contractor.

We note further that the drivers do not in any practical sense render a service to SIDA for which they are compensated; rather, SIDA is merely an administrative creature which provides certain facilities and opportunities to the drivers

for a price. SIDA does, however, hold itself out as a taxicab company, in that it is a signatory to several commercial contracts and uses its name in advertising. And certainly SIDA does maintain control over its drivers to the extent that the standard driver's contract imposes certain performance requirements and subjects drivers to SIDA's rules and regulations.

We are not persuaded, however, by the Board's conclusion [1] that the provisions of the driver's contract and the rules and regulations (and the means of enforcing them) evidence SIDA's substantial control over the drivers. By executing a contract with SIDA, the drivers do not submit themselves to SIDA's control as employees, but merely agree to associate with SIDA and to comply with its procedures. We disagree with the Board's contention that the rules and regulations are instruments of control for the benefit of SIDA as an entity; rather, they can more accurately be seen as being designed to enforce standards of conduct to which all of the drivers should adhere

1. In rejecting SIDA's independent contractor arguments in the representation proceedings, the Acting Regional Director, whose findings were subsequently affirmed by the Board, stated:

"In June, 1971, the Board concluded in a case involving the same Employer that a unit composed of dispatchers and taxicab drivers was appropriate. Sida of Hawaii, Inc., 191 NLRB No. 46. In the prior case the Board expressly held that the taxicab drivers were not independent contractors.

In October, 1972, prior to the hearing in the instant case, the Employer enacted new rules and regulations, which are applicable to its drivers. The violation of these rules and regulations by a driver constitutes grounds for discharge. The new rules and regulations provide, *inter alia*, that (1) the driver must be clean and neat in appearance and dress; (2) the driver's vehicle must be clean and in good mechanical condition; (3) the driver must not refuse short trips; (4) the driver must not play cards or gamble at hotels or at the airport; (5) the driver must obey the orders of dispatchers; (6) the driver must be courteous to passengers.

. . . The Employer's current rules and regulations provide for effective control

by the Employer over the day-to-day activities of the drivers."

In the prior *SIDA* decision, 191 NLRB No. 46, relied on by the Acting Regional Director, the Board had cited the following factors in support of its employee holding:

" . . . prospective drivers are interviewed and their police records are checked before they can drive for SIDA. (2) SIDA uniforms and name tags are required of all drivers. (3) All drivers must sign a contract with SIDA before being allowed to commence employment. (4) SIDA has the right to suspend or terminate any driver who fails to comply with the contract and with SIDA's rules and regulations. (5) SIDA has the sole discretion to decide whether or not a driver should be reinstated, and, if so, under what conditions. (6) Strict regulations are placed upon the amount drivers can charge for various services and upon the personal appearance and conduct of drivers. (7) SIDA enforces rules concerning the appearance and mechanical condition of cabs. (8) SIDA advertises its cab operation in the yellow pages. (9) Complaints against drivers are investigated by SIDA, and, where appropriate, disciplinary action is taken."

in order to promote the SIDA image for the mutual benefit of the Association and its drivers. Examples of such required conduct are that the drivers be neat and courteous, display the SIDA identification on their dome lights and uniforms, and follow the instructions of dispatchers and line operators.

Several of the Association's regulations simply incorporate the requirements imposed on SIDA by its commercial contracts and certain state and local ordinances (e. g., presence of line operators at the airport, liability insurance requirements, and rules regarding the personal appearance of the drivers). The Board has itself noted that the fact that a putative employer incorporates into its regulations controls required by a government agency does not establish an employer-employee relationship. Portage Transfer Co., Inc., 204 NLRB No. 117 (1973). Reisch Trucking and Transportation Co., Inc., 143 NLRB 953 (1963). Furthermore, we do not find the incorporation of the requirements of the SIDA-State of Hawaii contract to be inconsistent with an independent contractor relationship, in that such an incorporation benefits both parties by insuring continued operation under the contract.

■ The power of the Operations Committee to hear and act upon complaints does not constitute the type of control indicative of an employer-employee relationship. The majority of complaints come from the drivers themselves; the Committee is composed of drivers; and the prompt resolution of customer complaints benefits both parties. It appears evident that the Committee is primarily a self-regulatory mechanism, manned by drivers for the mutual benefit of drivers.

This court has previously endorsed the approach of the Restatement of Agency 2d § 220(2)[2] in distinguishing employees from independent contractors. *See* Brown v. NLRB, *supra,* 462 F.2d at 705. An application of the criteria enumerated in § 220(2) to the SIDA owner-operators reaffirms our conclusion that an independent contractor relationship is here disclosed.

■ Our decision here is further supported by the specific holding in *Brown,* wherein this court reversed the Board's finding that certain newspaper dealers were employees. In so concluding, the opinion reviewed the Board's prior decisions and synthesized three determinative factors:

(1) The entrepreneurial aspects of the dealer's business, including the right to control;

(2) The risk of loss and opportunity to profit; and

(3) The dealer's proprietary interest in his dealership.

The Board has argued that *Brown* is inapplicable here because it was a newspaper dealers case and therefore factually distinguishable. On the contrary, we

---

2. Restatement of Agency 2d § 220:
"§ 220. *Definition of Servant*
 \* \* \* \* \* \*
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business."

believe the rationale enunciated in *Brown* to be applicable to the general question of the employee-independent contractor distinction and thus supportive of the views herein expressed.

III. CONCLUSION

On the record before us, we find the SIDA owner-operators to be independent contractors rather than employees within the meaning of § 2(3) of the Act. Enforcement of the Board's order is therefore denied. In light of this determination, we find it unnecessary to rule upon the question of whether the Board erred in excluding stockholder owner-operators from the bargaining unit.