**AIR TRANSIT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1600.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1982.

Decided June 8, 1982.

Lawrence D. Levien, Washington, D. C. (Richard N. Appel, Berton Saul Klein, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., on brief), for petitioner.

Victoria A. Higman, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen.

Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Candace M. Carroll, Washington, D. C., on brief), for respondent.

Before MURNAGHAN and ERVIN, Circuit Judges, and WILKINS,* District Judge.

WILKINS, District Judge:

Air Transit, Inc. petitions for a review of an order of the National Labor Relations Board (hereafter the "Board") which found that taxicab drivers associated with Air Transit's business were "employees" within the meaning of Section 2(3) of the National Labor Relations Act (hereafter the "Act"), 29 U.S.C. § 152(3) (1964). Air Transit contends that the taxicab drivers are independent contractors. We agree. Accordingly, enforcement of the Board's order is denied.

## PROCEDURAL HISTORY

On August 7, 1978, the Communication Workers of America, AFL–CIO (hereafter the "Union"), filed an election petition with the Board. The Union sought certification as representative of certain taxicab drivers working for Air Transit. The Regional Director for Board Region Five dismissed the Union's petition, concluding that the drivers were independent contractors not covered by the Act. The Union appealed to the Board, which subsequently reversed the Regional Director's decision. *Air Transit, Inc.*, 248 N.L.R.B. 1302 (1980) (hereafter *"Air Transit I"*). The Board found that the drivers were employees under the Act and ordered that a representation election be held. This election was held in May, 1980 and resulted in a rejection of union representation by the drivers.

Prior to the Board's determination that the drivers were employees, two drivers, Anthony Herndon and James Edge, instituted unfair labor practice proceedings against Air Transit. Both men alleged that Air Transit had threatened them with disciplinary action for engaging in union organizing activity. Acting on these allegations, the Regional Director issued a complaint charging Air Transit with violation of Section 8(a)(1) of the Act. Air Transit defended on the ground that the drivers were independent contractors.

After reviewing and reaffirming its decision in *Air Transit I*, the Board entered summary judgment against Air Transit. *See Air Transit, Inc.*, 256 N.L.R.B. 44 (1981). The Board ordered Air Transit to cease from engaging in similar acts in the future and to post an appropriate notice stating that drivers would not be threatened for engaging in general union organizing activity or for giving testimony before the Board. Air Transit now petitions to set this order aside. The Board has cross applied for enforcement.

## FACTS

The appropriate status to be assigned to the taxicab drivers alleged to be Air Transit's business. Air Transit is a Virginia corporation engaged in the taxicab service at Dulles International Airport in Chantilly, Virginia. In 1974, the Federal Aviation Administration awarded Air Transit the exclusive right to operate a taxicab service between Dulles and points in the Washington Metropolitan Statistical Area.[1] In return, Air Transit agreed to provide safe, efficient taxicab service by making available a fleet of at least sixty air-conditioned, heated vehicles for use at Dulles.[2]

Air Transit satisfies its contractual obligations by utilizing the services of approximately 100 taxicab drivers who provide

---

* Honorable William W. Wilkins, Jr., United States District Judge for the District of South Carolina, sitting by designation.

1. In 1974, the FAA awarded Air Transit a three-year contract. In 1977, this contract was extended until July 31, 1980. Prior to July

1980, this contract was again renewed covering the present period.

2. Air Transit also pays the FAA an annual fee based on the number of passengers using the airport.

their own vehicles. Drivers operating under Air Transit's concession pick up passengers at Dulles by driving to a designated area where they join a "cab queue" or "feed line."[3] Air Transit positions a uniformed dispatcher at the head of the feed line who directs passengers to waiting taxicabs and aids them with their luggage. The feed line operates on a "first in first out" basis. Each taxicab is filled in order of its position in line. When the front taxicab is loaded and pulls out, the remaining taxicabs move forward.

Air Transit charges each driver a "stand fee" of $72.00 per week for the privilege of participating in the feed line and operating under its contract with the FAA.[4] Air Transit does not receive a share or percentage of the drivers' earnings. The stand fee is fixed and totally unrelated to the number of hours worked or the amount of money earned.[5] The drivers' earnings are never reported to Air Transit. There is no requirement that the drivers keep "trip sheets," manifests or other accounting of their earnings. All drivers retain absolute personal control over their own work schedules. Their hours, shifts and routes are governed solely by their personal preferences and financial needs. Air Transit does operate a radio dispatch system as required by its contract with the FAA. However, few of the taxicabs operating in Air Transit's fleet are equipped with radio receivers or transmitters.[6] Those drivers who have

radios are not required to respond to radio calls. Unanswered calls are referred to outside taxicab companies.

Drivers are not required to make pickups at Dulles. They may work anywhere their operating licenses permit. Those drivers who choose to work at Dulles are not required to participate in Air Transit's feed line. They may make special arrangements to pick up passengers at locations away from the line.

Air Transit does not own any taxicabs and does not make any repairs or inspections.[7] All taxicabs operating in the fleet are owned or leased by the drivers who are personally responsible for maintenance and fuel costs.[8] In the past, some drivers have financed the purchase of taxicabs through Air Transit. However, this is not required. All drivers are free to buy, sell and lease their taxicabs at will.[9] Of course, any lease or sale of a taxicab to a driver who intends to operate under Air Transit's concession is subject to Air Transit's approval.[10]

Most of the normal attributes of an employee-employer relationship do not exist between Air Transit and the drivers. For example, Air Transit provides none of the normal fringe benefits or record-keeping functions generally expected of an employer. The drivers receive no vacation time, sick leave, workmen's compensation or unemployment insurance. Air Transit does not provide an accounting of the drivers' income for tax purposes. All drivers are

---

3. Rules of conduct for operation of the feed line were established at a drivers' meeting called by Air Transit. At that meeting all drivers were given an opportunity to express their views on the matter.

4. Some drivers lease taxicabs from other drivers. The drivers who lease are charged an extra "stand fee" of $36.00 per week or $18.00 for Sunday leasing only. These stand fees have proved very stable and have only been changed on one occasion.

5. The fee is payable even if a driver fails to work at Dulles during the week or fails to drive at all.

6. Approximately twenty taxicabs in the fleet are equipped with radio transmitter-receivers.

7. Although Air Transit does no safety checks on vehicles, it has refused on several occasions

to allow taxicabs to enter the feed line which had obvious defects, such as broken headlights or bald tires. Air Transit is required under its contract with the FAA to provide safe taxicab service.

8. The drivers select their own fuel sources and repair stations. Fuel and repairs are costs paid by the drivers from their earnings without any contribution from Air Transit.

9. Drivers negotiate the terms of any lease or sale without supervision from Air Transit.

10. Although there appears some dispute on this issue, drivers usually receive approval if they have a chauffeur's license and the required insurance.

personally responsible for keeping such an accounting and for making sufficient periodic deductions from their earnings for payment of social security contributions and income taxes. Also, drivers receive no type of training and are not given road tests to evaluate their driving skills.[11]

Most of the rules which Air Transit has enforced against its drivers in the past are either mandated by Air Transit's contract with the FAA or required by Virginia law. Pursuant to its contract with the FAA, Air Transit requires all drivers to wear name tags,[12] maintain their taxicabs in a safe operating condition, and purchase replacement taxicabs after two years of operation in the fleet. Although drivers may buy or lease any make or model for use in the fleet,[13] it is required that all taxicabs be identically painted, bear the name "Airport Cab," and display Air Transit's telephone number. Further, pursuant to Virginia law, Air Transit requires that all drivers possess a valid chauffeur's license and that their vehicles be licensed for use as taxicabs in Louden County, Virginia. Also, it is required that all taxicabs display and charge the metered rates established by the Washington Metropolitan Air Transit Commission.

There are several rules enforced by Air Transit which are not required by the FAA contract or Virginia law. Perhaps the most important of these is a requirement that the drivers transport certain customers for "flat rates" negotiated by Air Transit. In the past, Air Transit has negotiated flat rate fees for taxicab service with several large corporate customers. Generally, these customers pay the drivers with "script" redeemable only through Air Transit. Air Transit also enforces a require-ment that all drivers post a notice in their taxicabs that passenger complaints may be filed at Air Transit's main office. All such complaints are thoroughly investigated. Finally, all drivers are apparently required to purchase greater insurance coverage than is required by Virginia law.[14]

## LAW

The question of whether the taxicab drivers should be classified as employees or independent contractors under the Act is determined by the application of common law agency principles.[15] *N.L.R.B. v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *N.L.R.B. v. Tri-State Transport Corp.*, 649 F.2d 993 (4th Cir. 1981). The analysis most often used at common law to resolve this issue is the "right to control" test. *N.L.R.B. v. Tri-State Transport Corp.*, 649 F.2d at 995; *N.L.R.B. v. Phoenix Mutual Life Insurance Co.*, 167 F.2d 983 (7th Cir. 1948), *cert. denied*, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948). When the person for whom services are performed retains the right to control the manner and means by which those services are to be accomplished and particularly when that person provides supervision as to the details of the work, the workers are considered employees. *Id.; SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d 354, 357 (9th Cir. 1975) (hereafter *"SIDA"*). However, when there is only control as to the final result, with little supervision over the means by which that result is to be accomplished, the workers should be considered independent contractors. *Id.; Local 777, Democratic Union Organizing Committee v. N.L.R.B.*, 603 F.2d 862, 873 (D.C.Cir.1978), *reh. denied*, 603 F.2d 891 (1979) (hereafter *"Yellow Cab"*).

11. Also, the drivers are not given any medical examinations to determine if they are physically qualified for the job.

12. Air Transit has not had any dress or grooming rules since 1978.

13. The drivers are generally allowed to equip their taxicabs as they like. However, Virginia law requires all taxicabs to have functioning heating and air conditioning systems.

14. The drivers select their own insurance companies and make premium payments without supervision from Air Transit. Air Transit does require drivers to submit accident reports on all on-the-job accidents.

15. The only question presented to this Court is whether the drivers are "employees" or "independent contractors" under the Act. It is conceded that if the drivers are employees, Air Transit violated Section 8(a)(1) of the Act.

The right to control test is correctly applied by considering the "totality of circumstances" involved. The degree of control exercised by an alleged employer should be assessed based on " 'all of the incidents of the relationship ... with no one factor being decisive.' " *N.L.R.B. v. Amber Delivery Service, Inc.*, 651 F.2d 57, 61 (1st Cir. 1981), *quoting N.L.R.B. v. United Insurance Co.*, 390 U.S. at 258, 88 S.Ct. at 990. Applying the right to control test based on the totality of circumstances involved in the present case, it is clear that the taxicab drivers should be classified as independent contractors for the purposes of the Act.

The facts of this case are very similar to those found in *Yellow Cab*. *Yellow Cab* involved a Chicago taxicab company which owned and maintained a fleet of uniformly painted taxicabs which it rented to drivers for a fixed fee. *Yellow Cab*, 603 F.2d at 866–78. These drivers were subjected to substantial control in their use of the taxicabs. They were limited to very short lease periods renewable at the company's sole discretion. *Id.* at 868. Also, they were prohibited from subleasing their taxicabs or driving more than 250 miles per day. *Id.* However, there was no requirement that drivers keep trip sheets or other accountings of their fares. *Id.* The lease fees were fixed and totally unrelated to the drivers' earnings. On these facts, the drivers were found to be independent contractors. In reaching this decision the Court focused primarily on the fact that the taxicab lease fees were unrelated to the profits earned by the drivers and, therefore, the company had "no financial incentive to exert control." *Id.* at 879. The Court stated:

> When a driver pays a fixed rental, regardless of his earnings on a particular day, and when he retains all the fares he collects without having to account to the company in any way, there is a strong inference that the cab company involved does not exert control over "the means and manner" of his performance. This conclusion is justified because under such circumstances, the company simply would have no financial incentive to exert con-

trol over its drivers.... However the driver conducts his occupation, the company has received its financial reward.... *Id.*

The same situation exists in this case. The stand fees paid by the drivers are fixed and unrelated to their earnings. No trip sheets or other accountings of fares are required. Air Transit makes no attempt to share in a percentage of the drivers' earnings. This creates a strong inference that Air Transit does not exercise substantial control over the means and manner of the drivers' performance of their work.

This inference is strongly supported by the presence of a large number of other factors which have been identified as being indicative of an independent contractor relationship. The Court in *SIDA* identified the following factors which mandated the conclusion that taxicab drivers operating under a system similar to the one utilized by Air Transport were independent contractors:

(1) The drivers make substantial personal investments in their taxicab activities. They purchase and maintain their own vehicles; obtain all necessary city and state permits; pay for their own health insurance, Social Security, unemployment benefits, and income taxes; maintain their own automobile insurance; and pay a monthly stall rental fee to SIDA in addition to a $0.50 trip fee for each trip out of the airport.

(2) The drivers are substantially independent in their operations. They are generally free to work or not work for SIDA when they choose; they may "moonlight" by working for other cab companies; they are free to make their own arrangements with clients and to develop their own goodwill; they are not limited to any particular area of operation ... fares are determined not by SIDA, but by local meter ordinances and are collected and retained by the drivers; SIDA supervision is greatest at the airport, but is there limited to line operators charged only with maintaining order in the cab queues—otherwise, SIDA's only

tangible connection with the drivers is by radio; SIDA pays no compensation to the drivers, makes no withholding, Social Security, or unemployment insurance deductions on their behalf, and keeps no income records for them.

(3) The driver's contract specifically provides that the relationship created is one of independent contractor. *SIDA,* 512 F.2d at 357–58.

Almost without exception, every factor included in this exhaustive list is present in this case.

Most of the factors on which the Board based its determination that Air Transit exercises substantial control over the drivers do not support that conclusion. The Board argues that because Air Transit requires all drivers to possess a valid chauffeur's license, to have their vehicles properly licensed as taxicabs, and to charge metered rates established by the WMATC, it exercises control. However, all of these are required by Virginia law and, as such, are not indicative of control. In *Yellow Cab,* 603 F.2d at 875, the Court stated:

> Government regulations constitute supervision not by the employer but by the state. Thus, to the extent that the government regulation of a particular occupation is more extensive, the control by a putative employer becomes less extensive because the employer cannot evade the law either and *in requiring compliance with the law he is not controlling the driver* (emphasis added). It is the law that controls the driver. Thus requiring drivers to obey the law is no more control . . . than would be a routine insistence upon the lawfulness of the conduct of those persons with whom one does business.

Also, the fact that Air Transit prohibits drivers from including taxicabs which are over two years old in the fleet and requires that all taxicabs be maintained in a safe, efficient operating condition is not necessarily evidence of control.[16] All of these requirements are mandated by Air Transit's contract with the FAA. Failure to promulgate and enforce such rules and regulations would place that contract in jeopardy.[17] Controls which are mutually beneficial to both Air Transit and the drivers are not inconsistent with the existence of an independent contractor relationship. *Id.* at 880. Controls which are designed to protect Air Transit's contract with the FAA obviously inure to the benefit of the drivers as well as Air Transit. In *SIDA,* 512 F.2d at 359, the Court stated:

> Several of the Association's regulations simply incorporate the requirements imposed on SIDA by its commercial contracts. . . . [W]e do not find the incorporation of the requirements of the SIDA–State of Hawaii contract to be inconsistent with an independent contractor relationship, in that such an incorporation benefits both parties by insuring continued operation under the contract.

Air Transit does exercise some control over the drivers. Primary among those controls is the fact that Air Transit negotiates flat rate fees for taxi service with corporate customers. Also, the drivers are required to purchase more insurance than is required under Virginia law. However, comparing these minor requirements with the great number of contrary factors present, they are clearly insufficient to support a finding that the taxicab drivers are employees.[18]

In conclusion, considering the totality of circumstances, there is not sufficient evi-

---

**16.** The same is true for the fact that Air Transit requires that all taxicabs be identically painted and display its insignia.

**17.** The Regional Director found that drivers were occasionally disciplined by Air Transit but stated: "Although there have been a few instances of drivers being disciplined by the employer (Air Transit), it appears that these actions were taken only when the drivers' con-

duct placed the employer's contract with the FAA in jeopardy."

**18.** Other minor restrictions include the fact that Air Transit adjusted passenger complaints against drivers and refused to allow any driver to have an ownership interest in more than one taxicab in the fleet.

dence in the record to support the Board's determination that the taxicab drivers are employees. Under *Yellow Cab*, the fact that Air Transit's earnings are unrelated to the drivers' earnings creates a strong inference that the drivers are independent contractors. This inference is greatly supported by a myriad of other factors which were identified in *SIDA* as indicative of a lack of employer control. Most of the factors which the Board argues are indicative of an employee relationship are either mandated by Air Transit's contract with the FAA or required by Virginia law. Those few remaining factors which support a finding that the drivers are employees are grossly outweighed by factors which favor a finding of an independent contractor relationship. Consequently, Air Transit's petition seeking reversal of the Board's order is granted. The Board's cross application for enforcement is denied.

ENFORCEMENT DENIED.