NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ASSOCIATED DIAMOND CABS, INC., Respondent.

No. 81-5907.

United States Court of Appeals, Eleventh Circuit.

April 11, 1983.

---

Muller, Mintz, Kornreich, Caldwell & Casey, Herbert B. Mintz, Miami, Fla., for respondent.

Elliot Moore, Deputy Associate Gen. Counsel, Richard A. Cohen, Atty., NLRB, Washington, D.C., for petitioner.

Before GODBOLD, Chief Judge, KRAVITCH, Circuit Judge, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

In this case the National Labor Relations Board (the Board) seeks enforcement of its Decision and Order against Associated Diamond Cabs, Inc. (the Company), reported at 254 NLRB No. 134 (1981). Jurisdiction is founded on § 10(e) of the National Labor Relations Act (the Act), as amended, 29 U.S.C. § 151 *et seq.*

## I. Procedural History

Pursuant to an election petition filed by the Brotherhood of Taxi Drivers Union, Local # 1 (the Union) and a hearing held on March 12, 1980, the Regional Director of the Board determined that the Union is a labor organization within Section 2(5) of the Act, that the Company is an employer under the Act, and that all taxi drivers qualifying as daily lessees or annual lessees are employees under the Act. A representation election was ordered and was held on April 23, 1980. Out of one hundred twenty-five (125) eligible voters, sixty-eight (68) cast ballots. Thirty-two (32) voted for representation by the Union, ten (10) against and an additional twenty-six (26) ballots were challenged. Thirteen of the twenty-six challenges were sustained by the Regional Director on the basis that the voters were ineligible to vote on the day of the election. The Regional Director did not rule on the eligibility of the other thirteen ballots, challenged on the basis that the voters were supervisors within the meaning of Section 2(11) of the Act, because thirteen votes were not sufficient to change the result of the election even if all were cast against the

Union's representation. Accordingly the Union was certified as the exclusive bargaining representative for

All full-time and regular part-time taxi drivers, including steady daily lessees, extra board daily lessees and annual lessees employed by the Employer at its Miami, Florida facility; excluding all shareholder/owner-drivers, garage men, mechanics, dispatchers, office clericals, guards and supervisors as defined in the Act.

The Company refused to bargain with the Union and the NLRB found that the refusal was a violation of Section 8(a)(5) and (1) of the Act. The Board brought this action, seeking to enforce its order.

## II. Facts

The Company is a Florida corporation engaged in the operation of a taxicab service in Dade County, Florida. It is an association of thirty-three taxicab owners and is governed by a six member Board of Directors who are cab owners elected by the association members.

The majority of those driving cabs under the auspices of the Company name, approximately 125 drivers, lease their cabs from the Company pursuant to standardized, daily lease agreements. The daily lease agreements require the lessees to pay a flat fee or "nut," plus a mileage charge, for each shift driven. For the day shift (5:30 a.m. to 3:30 p.m.), the nut is $28.50 and the mileage charge is $.13 per mile. For the night shift (3:30 p.m. to 5:30 a.m.) the nut is $29.50 and the mileage charge is $.15 per mile. Payments of the nut and mileage charges are collected by the Company at the end of each shift. The nut must be paid once a cab is taken out for a shift regardless of how many miles are driven or whether the driver is on duty for the entire shift. The nut for the daily lessees includes the price of one tank of gas provided by the Company. The daily lease agreement provides: "In order to protect Lessor's good will and licenses, Lessee shall keep himself and said taxicab in a neat and clean condition and agrees to conduct himself and operate said taxicab reasonably, prudently, gentlemanly

and courteously in a careful manner and in conformity with all laws, ordinances and regulations of the United States, State of Florida and Metropolitan Dade County, and the respective municipalities in which the Lessor operates...." The daily lease agreement also provides: "By this Agreement, the Lessor and Lessee acknowledge and agree that there does not exist between them the relationship of employer-employee ... but that the relationship of the parties hereto is strictly that of lessor-lessee, the lessee being an independent contractor free from interference or control on the part of the lessor in the operation of said taxicab subject only to adherence to applicable statutes and ordinances...."

Taxicabs driven by the daily lessees are insured by the Company through Y.D. Taxi Corp., a company that provides self-insurance for the Company and other taxicab associations, and which has some common officers with the Company.

Approximately sixty-five (65) of the daily lessees are "steady" drivers who voluntarily have indicated their desire to work a set five- or six-day week and regularly drive the same cab. They work the days set by the cab's owner and are charged the set nut if they fail to arrive for a scheduled shift. The other daily lessees are "extra board" drivers who drive on a daily basis as taxicabs are available. As of nine months prior to the initial hearing in this matter, when Tom Donnelly became manager, the Company discontinued a seniority system of assigning taxicabs to extra board drivers and instituted a first-come, first-serve method of assignment. Extra board drivers are not disciplined for refusing a particular cab assignment but, as another will not be assigned, will forfeit a day's work if a cab is rejected for other than unsafety or defects such as ineffective air conditioning which impact negatively on customer goodwill. A practice exists whereby if a daily lessee is late in returning his cab and thereby cuts into the driving time on the next shift, he will pay a portion of the nut of the driver on the next shift. No disciplinary action is taken directly by the Company.

Both parties indicate in their briefs that annual lessees, unlike daily lessees, generally own their own cabs and, per a standardized lease agreement, rent the necessary permit, taxi meter, taxi light, and use of the dispatch system from the Company. The annual lessees also pay weekly fees to cover insurance and pay the permit fees due the city. The lease agreement and testimony at the hearing indicate that some of the taxicabs themselves are leased from individual owners for a one-year period; weekly installments are paid on an annual fee negotiated by the individual owner and the lessee-driver. All annual lessees supply all their own gasoline but can buy gasoline at a discounted price from the Company. Neither annual nor daily lessees can sublease the taxicabs, but annual lessees may hire replacement drivers who have filled out an application with the Company and are licensed by the city to drive for the Company.

Anyone who drives a Company cab must have filed an application with the Company's manager and have received a license from the city to drive for the Company. The Company supplies a standard application form but makes no independent inquiry into a driver's qualifications, leaving it to the city to investigate whether the applicant has any criminal record or is in any way ineligible for a license. Miami City Code § 56–13.

The city requires all drivers to maintain daily "trip sheets" recording all trips made, their origin and destination, the fares charged and the time of each trip. Miami City Code § 56–69. The Company has prepared trip sheets on envelopes which are submitted to the Company at the end of each shift and in which the drivers enclose their daily mileage and nut fees. The Company, however, makes no independent use of the trip sheets, merely retaining them for city inspection.

The Company will not allow daily lessees to drive more than twenty-four consecutive hours and will suggest the same limitation for annual lessees.

While the daily lease provides that the lessee shall "keep the taxicab and himself in a 'neat and clean' condition" and operate the taxicab "reasonably, prudently, gentlemanly, and courteously in a careful manner," undisputed testimony reveals that the Company enforces no dress code. The city requires, as a condition of obtaining and retaining a taxicab permit, that the taxicabs be maintained so as not to "interfere with or detract from the comfort, convenience or safety of the passengers transported therein." Miami City Code § 56–30.

The manager of the Company investigates customer complaints by speaking to the driver involved. If corrective action is suggested but the driver refuses to comply with the suggestion, the Company metes out no discipline directly but refers the customer to the police department where a complaint may be lodged. In extreme cases where the driver is consistently abusive to passengers the Company may refuse to continue to lease him a taxicab.

The Company operates a central dispatch system through which calls are conveyed to individual drivers. The dispatcher announces the call generally over the dispatch system and it is within the discretion of the individual drivers to respond or not to any particular call. Drivers are free under usual circumstances to prospect independently for business from persons on the street.

The Company maintains contracts with certain institutions, including the Veteran's Administration Memorial Hospital, certain military bases and a blood bank. If a driver consistently refuses to accept dispatched fares from these institutional customers he will no longer be given these dispatched fares. The Company has instructed its drivers not to prospect independently for fares at the Veteran's Administration Hospital but to wait at the nearest taxi stand for dispatches to the hospital.

The Company's insurance policy provides for cancellation of coverage if a driver has three or more "at fault" accidents within a 12-month period and, hence, the driver will be terminated by the Company if three such accidents occur. The Company manager interviews any driver who has been in an accident and the insurance adjuster investigates to determine fault.

### III. Issues

Since the inception of these proceedings the Company has argued that both the daily lessees and the annual lessees are independent contractors and, thus, are not "employees" within the meaning of Section 2(3) of the Act, 29 U.S.C. § 152(3). Alternatively, the Company has urged that if daily lessees are "employees" within the meaning of the Act so too should annual lessees be treated as employees. Initially the Union did not attempt to include the annual lessees in the bargaining unit. The Regional Director determined, however, that both daily lessees and annual lessees are employees and this finding the Board defends in this action. The Regional Director also found that those annual lessees who hire substitute drivers are supervisors within the meaning of 29 U.S.C. § 152(11) and thus are not includable in the bargaining unit. Neither the Regional Director nor the Board have ever determined how many of the annual lessees who cast ballots fit this criterion. The Company argues on appeal that there is no substantial evidence to support this finding.

The first question that we will address is whether the daily lessees qualify as employees or independent contractors.

### IV. The Law

Section 152(3) of the Act, 29 U.S.C. § 152(3), specifically exempts independent contractors from the definition of employees. An employer is in violation of the Act for a refusal to bargain collectively only if the Union represents employees, 29 U.S.C. § 158(a)(5). Much confusion and fine-line-drawing is presented by the case law addressing the question of whether particular agents are independent contractors or employees. Determination of a worker's status must be made by reference to the principles of the common law of agency. *N.L.R.B. v. United Insurance Co.*, 390 U.S. 254, 256, 88 S.Ct. 988, 989, 19 L.Ed.2d 1083 (1968); *N.L.R.B. v. Deaton, Inc.*, 502 F.2d

1221 (5th Cir.1974),[1] *cert. denied,* 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975). The Board's determination that the daily lessees are employees as opposed to independent contractors, as with certain other questions arising under the Act, "depends on the application of law to facts, and the legal standard to be applied is ultimately for the courts to decide and enforce." *Allied Chemical and Alkali Workers v. Pittsburgh Glass Co.,* 404 U.S. 157, 182, 92 S.Ct. 383, 399, 30 L.Ed.2d 341 (1971). *See also N.L.R.B. v. United Insurance Co.,* 390 U.S. at 260, 88 S.Ct. at 991; *Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America v. N.L.R.B.,* 603 F.2d 862, and accompanying opinion on denial of petition for rehearing, 603 F.2d 891, 906 (D.C.Cir.1978) (hereinafter *Local 777, Seafarers*). Of course, if the factual findings on which the Board's decision is based are supported by substantial evidence, *N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1223, and those factual findings present two fairly conflicting views as to whether the lessees are employees or independent contractors, this court should enforce the Board's decision. *N.L.R.B. v. United Insurance Co.,* 390 U.S. at 260, 88 S.Ct. at 991.

Exemption of independent contractors from the scope of the Act occurred in 1947 as a direct Congressional response to judicial enforcement of expansive interpretations by the Board of the definition of employees, particularly *N.L.R.B. v. Hearst Publications,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). The House Report on the bill that ultimately was passed to exempt independent contractors stated:

> "Employees" work for wages or salaries under direct supervision. "Independent contractors" undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits.

H.R.Rep. No. 245, 80th Cong., 1st Sess. 18 (1947), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, 309 (1948).

Thus, Congress intended for the line between "employees" and "independent contractors" to be drawn by reference to the traditional principles of agency law and, within those principles, the degree to which agents have only a vicarious interest in the work as opposed to an independent entrepreneurial interest in the venture. The Supreme Court has counseled that "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *N.L.R.B. v. United Insurance Co.,* 390 U.S. at 258, 88 S.Ct. at 991. *See also N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1223–24.

The former Fifth Circuit recognized that the "control test" is "an important desideratum" in distinguishing employees from independent contractors. *N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1223. The court also noted that the "control test," if interpreted narrowly to mean the degree of supervision by the putative employer over the agent, while perhaps the most important element, is not the sole factor to be considered. *Id. See also Local 777, Seafarers,* 603 F.2d at 873. Rather as recognized by the Board and other circuit courts, application of a broader test, one which considers all of the circumstances of the relationship, is required. *Id.* 502 F.2d at 1223–24. *See also Air Transit, Inc. v. N.L.R.B.,* 679 F.2d 1095 (4th Cir.1982); *Local 777, Seafarers,* 603 F.2d at 872–73; *SIDA of Hawaii, Inc. v. N.L.R.B.,* 512 F.2d 354, 357 (9th Cir.1975). Stated somewhat differently, whether agents are employees or independent contractors requires application of a control test which takes into account the degree of supervision, the entrepreneurial interests of

---

**1.** In the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), this court adopted as precedent all decisions of the Former Fifth Circuit decided prior to October 1, 1981.

the agent and any other relevant factors. *N.L.R.B. v. Deaton, Inc.*, 502 F.2d at 1223–24; *Frito-Lay, Inc. v. N.L.R.B.*, 385 F.2d 180, 187 (7th Cir.1967).

■ Several aspects of the control test have received particular attention. First, the courts have noted that it is the *right* to control, not the actual exercise of control, that is significant. *Id.* 502 F.2d at 1224. *See also Local 777, Seafarers*, 603 F.2d at 874; *Deaton Truck Line, Inc. v. N.L.R.B.*, 337 F.2d 697, 698 (5th Cir.1964), *cert. denied sub nom. Teamsters Local 612 v. N.L.R.B.*, 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965). Second, control over the manner and means of the agent's performance and the details of the work as opposed to mere economic control or control over the end result of the performance is indicative of employee status. *Local 777, Seafarers*, 603 F.2d at 874–75; *N.L.R.B. v. Deaton, Inc.*, 502 F.2d at 1224. Finally, and quite significantly, control, in order to evidence employee status, must be control by the employer, not simply employer oversight of control exercised by a regulatory governmental body. *Local 777, Seafarers*, 603 F.2d at 875–76; *SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d at 359. *See also N.L.R.B. v. Deaton, Inc.*, 502 F.2d at 1224–28 (existence of control by employer in addition to control imposed by the ICC justifies finding of employee status).

The Regional Director's decision, on which the Board relied in determining that the Company was engaged in an unfair labor practice by refusing to bargain collectively, listed eleven findings in support of the conclusion that the daily lessees were "employees," not independent contractors. Exercising our duty to ensure the proper application of agency law principles to the facts as found by the Regional Director, we find that many of these eleven findings are irrelevant to a determination of a right to control and in drawing the line between employees and independent contractors. Other of the findings are unsupported by evidence in the record. The remaining factors, while perhaps relevant to the issue of control, indicate only an infinitesimal degree of control and do not support the conclusion that the daily lessees are employees. In addition, the Regional Director failed to highlight certain undisputed facts which strongly indicate independent contractor status.

■ The Regional Director first found that "(1) the daily lessees have no investment in the Employer's taxicabs, which are the instrumentalities of their work." While the daily lessees never acquire an ownership interest in the leased cabs, for each and every shift that they drive they must pay $28.50 or $29.50 plus a mileage fee. For one who drives on a consistent basis, this constitutes an investment of several thousand dollars over the course of a year. As stated by the D.C. Circuit in *Local 777, Seafarers*:

> In the usual employment relationship, the employer not only owns the instrumentalities of labor, but also supplies them free of charge to the worker. Rather than leasing out tools so that the 'employees' can pursue *their* chosen ends, the typical employer hires the employees to operate his machines in order to accomplish *his* chosen ends. The relationship of leasing drivers to their cabs is radically different from that of the ordinary employee using or operating his employer's tools. The lessee uses the instruments which he leases to produce as much income for himself as possible; the latter merely collects a wage for operating instrumentalities to produce wealth for his employer.

*Local 777, Seafarers*, 603 F.2d at 878 (emphasis in original). *See also id.* at 898. Thus, the finding that daily lessees have no investment in the taxicabs is not supported by the evidence.

■ The second finding, applicable to both daily and annual lessees, was that neither, under the terms of the lease agreement, are allowed to sublease the taxicabs. While we cannot say that this is not a limitation on the lessee's independent use of the cabs, it is not the type of limitation that constitutes control over the "manner and means" or details of the work performed. *Air Transit v. N.L.R.B.*, 679 F.2d at 1099;

*Local 777, Seafarers,* 603 F.2d at 874; *SIDA of Hawaii, Inc. v. N.L.R.B.,* 512 F.2d at 357. Cf. *N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1227 (right to control evidenced when employer may disqualify driver because of dissatisfaction with performance). Rather it is a reasonable method for a party to ensure that he is contractually bound only to persons with whom he has a direct relationship. See *Local 777, Seafarers,* 603 F.2d at 901 & n. 32 (no-subleasing provision designed to protect lessor's property and the Board's previous decisions have indicated that they do not treat a no-subleasing provision as "overwhelmingly important").

■ The third finding was that income from advertisements carried on the leased cabs goes to the employer. (Annual, as opposed to daily, lessees do receive a $2.00 per week rebate from advertising). This conclusion is totally irrelevant to the issue of an employer's control over the lessees and virtually irrelevant to any other consideration in the determination of employer/independent contractor status. Rather it buttresses the uncontested fact that the employer, not the driver, owns the taxicab and the advertising thereon. The fact remains, however, as discussed *supra,* that the drivers, while not the owners of the taxicabs, are not merely operating the employer's cabs "to produce wealth for his employer" in exchange for a wage, but are leasing an instrumentality to produce as much profit for themselves as possible. All that the finding regarding advertising indicates is that the lessee's investment does not cover any rights to advertising capacity.

The fourth finding was that "the duration, hours of work, and other terms of both the daily and annual leases are fixed by the Employer without negotiation with the lessees, and can be unilaterally changed by the Employer."

■ Preliminarily we find that this ruling as to "hours of work" is unsupported by the evidence. The record reveals that taxicabs are dispensed to the extra board drivers on a first-come, first-serve basis at the beginning of either the day shift (5:30 a.m. to 3:30 p.m.) or the night shift (3:30 p.m. to 5:30 a.m.). The record reveals further that while drivers will be allowed to drive two consecutive shifts, the Company manager will not allow an extra board driver to lease a cab for more than a twenty-four hour period. Beyond this, however, the Company exercises absolutely no restraint over the hours a lessee drives. In any twelve-hour shift the lessee may drive twelve or one hour, at his discretion. He may return the taxicab to the garage at any point during the shift. Cf. *City Cab Co. of Orlando, Inc. v. N.L.R.B.,* 628 F.2d 261, 264 (D.C.Cir.1980) (cabs could not be returned between 11:30 a.m. and 2:30 p.m.). The hours of work of those daily lessees who are "steady" drivers are no more regulated. Those daily lessees who desire to drive the same cab on a regular five-or six-day period may invoke, in their total discretion, the option to agree to report each day to drive the same taxicab. The "steady" driver simply arrives at the same time and pays the nut for each of the days he has agreed to drive a particular car. As with "extra board" drivers, the "steady" drivers may drive one or all twelve of the hours of a shift; the Company has no interest and no control over the hours driven.

■ The remainder of this fourth finding simply is irrelevant to the issue of control and "employee" versus independent contractor status. That the Company sets the standardized lease terms and in some instances unilaterally changes them, even if true, is indicative only of relative bargaining power, not an employee-employer relationship. *Local 777, Seafarers,* 603 F.2d at 899.

■ The fifth finding was that "drivers are required to keep themselves in a 'neat and clean' condition." This requirement is embodied in the lease but consistently is unenforced by the Company. As noted *supra,* however, the inquiry is of the right to control, not only the exercise of that control, *N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1224; see also *Local 777, Seafarers,* 603 F.2d at 874; and therefore this finding does indicate some, although only a vague and

minor degree of, control. Unlike the extensive dress code imposed in *City Cab Co. of Orlando, Inc. v. N.L.R.B.,* 628 F.2d at 265, requiring a driver to be 'neat and clean' has little impact on the details of the work. *See Local 777, Seafarers,* 603 F.2d at 902; *SIDA of Hawaii, Inc. v. N.L.R.B.,* 512 F.2d at 357 & n. 1.

Finding number six was that "all drivers must make out trip sheets as required by the City of Miami, which are kept by the Employer for inspection by the city, pursuant to the city's municipal code. As noted *supra,* the Miami City Code § 56–69 expressly requires each driver to maintain daily records, designated trip sheets, of the time, origin, destination and fare of all trips made. The Company collects the trip sheets from the drivers and retains them solely so that they will be available if and when the city desires to inspect them. The Company makes no independent use of the trip sheets. Indeed, as alluded to previously, they could have no interest in the information on the trip sheets as the revenue the Company receives is totally divorced from the receipts of the drivers. The Company does not discipline drivers for failure to submit trip sheets.

Other Courts of Appeals and the Board have placed much reliance in assessing control and supervision of agents on the presence or absence of an employer-imposed requirement that drivers maintain trip sheets. *Compare Air Transit v. N.L.R.B.,* 679 F.2d at 1100 and *Local 777, Seafarers,* 603 F.2d at 876 *with City Cab Co. of Orlando, Inc. v. N.L.R.B.,* 628 F.2d at 264. In *City Cab Co. of Orlando, Inc. v. N.L.R.B.,* 628 F.2d at 264, reasoning from the *Local 777, Seafarers'* finding that the absence of a trip sheet requirement was a significant indication of lack of control, the court stated: "the *presence* of a trip sheet requirement militates strongly *in favor* of employer control." (emphasis in original). In *City Cab Co. of Orlando, Inc.,* however, the trip

sheets were required by the employer and in its own interest, as opposed to the situation here where the trip sheet requirement is imposed solely through city regulation.

▮ Consistently the courts have held that regulation imposed by governmental authorities does not evidence control by the employer. *Air Transit v. N.L.R.B.,* 679 F.2d at 1100; *Local 777, Seafarers,* 603 F.2d at 875–76; *SIDA of Hawaii, Inc. v. N.L.R.B.,* 512 F.2d at 359. Indeed, employer imposed regulations that incorporate governmental regulations do not evidence an employee-employer relationship, *Air Transit v. N.L.R.B.,* 679 F.2d at 1100; *Local 777, Seafarers,* 603 F.2d 875–76; *SIDA of Hawaii, Inc. v. N.L.R.B.,* 512 F.2d at 359; *see also N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1226–28; *Portage Transfer Co., Inc.,* 204 N.L.R.B. No. 117 (1973); *Reisch Trucking and Transportation Co., Inc.,* 143 N.L.R.B. 953 (1963); unless pervasive control by the employer exceeds to a significant degree the scope of the government imposed control. *Local 814, I.B.T. (Santini Brothers),* 223 NLRB 752, 753, enforcement ordered, 546 F.2d 989 (D.C.Cir.1976); *N.L.R.B. v. Cement Transport, Inc.,* 490 F.2d 1024, 1027 (6th Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974).

▮ Here the requirement that trip sheets be maintained is not imposed on the drivers by the Company but only by the city code. Thus, the existence of the requirement is "not indicative of control" by the employer, *Air Transit v. N.L.R.B.,* 679 F.2d at 1101; rather "Government regulations constitute supervision not by the employer but by the state ... [and] [i]t is the law that controls the driver." *Local 777, Seafarers,* 603 F.2d at 875.[2] Accordingly, the sixth finding of the Regional Director does not support a finding of employer control.

▮ The seventh finding was that "drivers must conduct themselves in a rea-

**2.** Our holding in *N.L.R.B. v. Deaton, Inc., supra,* is not to the contrary. There we affirmed the Board's reliance on a finding of control and its resultant conclusion that the truck drivers in issue were "employees" because in addition to

enforcement of ICC regulations, the employer independently imposed additional, substantial control. *See N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1226–28.

sonable, courteous manner, and contractually must abide by all applicable city and other governmental regulations and ordinances." The immediately preceding discussion indicates that the contractual requirement of compliance with regulations and ordinances does not support a finding of employer control. The lease requirement of reasonable and courteous behavior, as with the requirement of the drivers keeping themselves "neat and clean," *see* discussion of the fifth finding *supra,* does evidence some minor right of control, but it presents only a slight, potential impact on the details of the work. *Local 777, Seafarers,* 603 F.2d at 902; *SIDA of Hawaii, Inc. v. N.L.R.B.,* 512 F.2d at 357.

Finding number eight simply is unsupported by the evidence in the record. The Regional Director found that "drivers lose revenue if they fail to take fares pursuant to certain dispatches at taxi stands, or if they refuse to carry customers with whom the Employer has a contract to supply taxi service." The record contains undisputed testimony that any driver may refuse a call put through on the Company's dispatching system; the call simply is given to another driver, and no disciplinary action is taken against a driver who does not accept or accepts and then decides to reject a call. The record also reveals that the largest percentage of the Company's business is handled through radio dispatches. Another significant portion of business is pursuant to contracts with institutional customers whose request for a taxicab are dispatched through the Company. However, the record is silent as to whether or to what degree individual drivers lose revenue by rejecting general dispatches or calls to service contract customers. Indeed, even though one of the Company's major problems is the failure of drivers to respond to calls, the record shows that a driver ordinarily would not reject such calls unless another customer hailed him on the way to respond to a dispatched call. In some situations drivers refuse calls because of a sense that the trip is not worth the time and difficulties involved but the record does not show that such a refusal over the course of one or several shifts leads to loss of revenue for the driver. All that is indicated is that a consistent refusal to respond to dispatches to contract customers may lead to the dispatcher no longer offering contract customer dispatches to that driver. It may well be that a driver who does not respond to a dispatch request is profitably using his time instead to service customers who have not put in a call through the dispatcher. The record does not support a contrary determination; hence this finding is unsupported by substantial evidence. *Cf. City Cab Co. of Orlando, Inc. v. N.L.R.B.,* 628 F.2d at 264 (record revealed that only about 10% of individual drivers' income was earned from individual prospecting as opposed to responding to dispatched calls). Even if the finding were supported by the record, it is not indicative of "employee" status or control by the Company. The evidence is undisputed that, even if it causes loss of revenue, it is the driver's independent choice to forego responding to dispatched calls. The loss of revenue thus favors a finding of independent status rather than an employer-employee relationship.

As also found by the Regional Director: "the cabs carry the logo of the Employer, and goodwill arising from the operation of the cabs inures exclusively to the Employer." This same conclusion was reached by the Board in *Local 777, Seafarers* and soundly rejected by the D.C. Circuit. We reject it for the same two reasons. First, like the finding concerning advertising, it is of no relevance to the issue of supervision of the drivers. 603 F.2d at 898. If it is relevant at all to the inquiry, it would be in relation to the entrepreneurial interests of the drivers. In this light, the finding is simply erroneous. Here as in *Local 777, Seafarers,* "goodwill does inure *directly* to the benefit of the lessees who drive the cabs. It is their principal stock in trade. Every fare a cab driver receives is based in substantial part on the goodwill which the drivers build up.... It is incorrect for the Board to state that the drivers do not benefit from the goodwill they create." *Id.* (emphasis in original).

■ Continuing the litany of irrelevant findings the Regional Director also highlighted that "the work performed by the drivers is an essential part of the Employer's operation." This proves nothing in regard to the inquiry before us as it is also true in many relationships which are undisputedly that of a company to independent contractors. *See Local 777, Seafarers v. N.L.R.B.*, 603 F.2d at 898–99, citing *Lorenz Schneider Co., Inc. v. N.L.R.B.*, 517 F.2d 445, 451 (2d Cir.1975) (activities of insurance agents is obviously essential part of insurance company's business but agent are not thereby made employees).

■ Finally, the Regional Director relied on the fact that "the Employer disciplines drivers through the threat of city action pursuant to a scheme of municipal regulations...." If one conclusion is inescapable from the record in this case it is that the Company discusses problems with the drivers but disciplines them for virtually nothing. Indeed the referral of customers with complaints to the city for their relief and the reliance on the city to enforce its own regulations evidences a clear abdication of discipline or control by the Company. No evidence even tends to show that the Company for its own disciplinary purposes *threatens* the lessees because of noncompliance with municipal regulations. Once again this same finding was used in *Local 777, Seafarers* and rejected by the D.C. Circuit. "[R]equiring drivers to obey the law is no more control by the lessor than would be a routine insistence upon the lawfulness of the conduct of those persons with whom one does business." *Id.* at 875, 901. *See also Air Transit v. N.L.R.B.*, 679 F.2d at 1100; *SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d at 359; *N.L.R.B. v. Deaton, Inc.*, 502 F.2d at 1226–28.

■ In review then, only three of the eleven findings relied on by the Board and the Regional Director are both relevant and supported by the record. Those three findings, that no subleasing is allowed, drivers must be "neat and clean" and must behave reasonably and courteously, simply do not constitute substantial evidence that the daily lessees are "employees." *N.L.R.B. v. Deaton, Inc.*, 502 F.2d at 1223.

The Regional Director failed to emphasize that the fees paid by the lessees and constituting the revenue of the Company are "unrelated to the profits earned by the drivers and, therefore, the Company ha[s] 'no financial incentive to exert control.'" *Air Transit v. N.L.R.B.*, 679 F.2d at 1099, quoting *Local 777, Seafarers*, 603 F.2d at 879. This fact alone creates a strong inference of independent status of the lessees, *id.*, one which is not overcome by the three minor indicia of control by the Company. Further, no weight was given to the fact that the daily lease agreement explicitly states that the lessees are independent contractors, not employees. *See SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d at 358; *Lorenz Schneider Co., Inc. v. N.L.R.B.*, 517 F.2d at 449.[3]

We emphasize the fact that so many of the issues raised by the Regional Director's findings were resolved by reference to the precise language of opinions on this issue in other circuits, particularly *Local 777, Seafarers*. In the *Seafarers* opinion, the D.C. Circuit pointed out that the inclusion by the Board of so many factors to support its decision that were either irrelevant or unsupportable "indicates that the Board is straining at gnats to find some evidence to support its conclusion that drivers are 'employees.'" *Id.* at 903. Seemingly undaunted by the fact that these gnats were swatted away by the D.C. Circuit in *Local 777, Seafarers*, prior to that opinion by other circuits, *Lorenz Schneider Co., Inc. v. N.L.R.B.*, 517 F.2d 445, 452–53 (2d Cir.1975); *Associated General Contractors v. N.L.R.B.*, 564 F.2d 271, 279 (9th Cir.1977); *SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d 354, 357 (9th Cir.1975); *Meyer Dairy, Inc. v. N.L.*

---

**3.** The Board also neglected to focus on the fact that the Company deducts no Social Security or income taxes from the lessee's receipts; payment is left to the individual. This is a strong indication of absence of employee status. *Air Transit v. N.L.R.B.*, 679 F.2d at 1100; *SIDA of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d at 358.

*R.B.,* 429 F.2d 697 (10th Cir.1970), and more recently by the Fourth Circuit, *Air Transit v. N.L.R.B.,* 679 F.2d 1101 (4th Cir.1982), the Board sought to impose the same infestation on the Eleventh Circuit. The effort is to no avail.

We hold that the daily lessees are independent contractors and not employees of the Company and the contrary finding of the Board is unsupported by substantial evidence. *N.L.R.B. v. Deaton, Inc.,* 502 F.2d at 1223. The record does not support "two fairly conflicting views," *N.L.R.B. v. United Insurance Co.,* 390 U.S. at 260, 88 S.Ct. at 992, but only one: the daily lessees are independent contractors. *A fortiori* the annual lessees, over whom the Company concededly exercises even less control and who have a greater investment and entrepreneurial interest in the taxicabs than the daily lessees also are independent contractors.[4] Accordingly, the enforcement of the order of the Board is DENIED.

Lynne, District Judge, sitting by designation, dissented and filed opinion.

4. Having reached this result it is unnecessary for us to reach the issue of whether the annual lessees are supervisors because, as independent contractors, they do not qualify as employees and therefore, supervisors or not, would not properly be included in a bargaining unit. 29 U.S.C. § 152(3).