**YELLOW TAXI COMPANY OF MINNE-APOLIS, d/b/a Suburban Yellow Taxi Company, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–1481.

United States Court of Appeals, District of Columbia Circuit.

Argued March 29, 1983.

Decided Nov. 4, 1983.

As Amended Dec. 22, 1983.

Petition for Review of an Order of the National Labor Relations Board and Cross-Application for Enforcement.

Robert E. Haythorne, Chicago, Ill., for petitioner.

Allison W. Brown, Jr., Washington, D.C., with whom Elliott Moore, Deputy Associate General Counsel, Washington, D.C., was on the brief, for respondent.

Before WRIGHT and BORK, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

Concurring opinion filed by Circuit Judge J. SKELLY WRIGHT.

Concurring opinion filed by Circuit Judge BORK.

MacKINNON, Senior Circuit Judge:

We are again called upon to review a decision of the National Labor Relations Board (the Board), holding that cab drivers who drive taxis under a lease which expressly provides that they are independent contractors are nevertheless employees within the meaning of the National Labor Relations Act (the Act).[1] Like the Administrative Law Judge,[2] we find the facts in this case to be "not materially distinguishable" from those in our earlier decision in *Local 777, Democratic Union Organizing Committee, Seafarers International Union of North America v. NLRB (Seafarers)*, 603 F.2d 862 (D.C.Cir.1978). That decision, which held the drivers to be independent contractors, controls the disposition of this case and, accordingly, we reverse the Board's decision.

## I. BACKGROUND

Minneapolis Yellow Taxi Company, Inc. (Minneapolis Yellow) conducts a taxicab business in the City of Minneapolis and many of its suburbs through five operating divisions. The division that is the subject of this case is Suburban Yellow Taxi Company (Suburban), which does business in several southern and southwestern suburbs of Minneapolis that are adjacent to or close by the Minneapolis-St. Paul Metropolitan International Airport (Airport). The legis-

---

1. The relevant statutory provision is section 2(3) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(3) (1976).

2. *Yellow Taxi Co. of Minneapolis*, No. 18–CA–5506, slip op. at 23 (Sept. 13, 1979) (hereinafter referred to as "ALJ Decision"), *attached to* Yellow Taxi Company of Minneapolis, 249 N.L. R.B. 35 (1980) (J[oint] A[ppendix] 42).

lative act which created the Airport gives it the same status as a municipal corporation.[3] The principal suburbs served by Suburban are Bloomington (81,831), Richfield (37,851) and Edina (46,073), which according to the 1980 census have a combined population of 165,755. Other adjacent suburbs bring the population in the area serviced by Suburban to over 200,000. The Airport, Bloomington and Richfield have ordinances regulating taxicabs. Tr. 105, 128, 133, 181.[4] Taxicabs operate in other adjacent suburban communities without licenses, Tr. 31–32 (JA 93–94), but all the communities establish the same meter rates. Tr. 410–11.

As the NLRB brief states:

Prior to March 1, 1977, all drivers at both [Minneapolis] Yellow Taxi and [Suburban] were "commission drivers" who were paid on the basis of a percentage of their gross receipts. The commission drivers were covered by [a] collective bargaining agreement [with the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, Local Lodge 3025, AFL–CIO (the Union and petitioner herein)]. On March 1, 1977, Minneapolis Yellow instituted a "voluntary" leasing program at [Suburban] whereby, for a scheduled fee accompanied by a posted bond, the driver became a "lessee" of the cab for an agreed upon term and was entitled to keep his receipts rather than turn them in, as did the commission drivers. By August 1977, of the approximately 100 drivers operating the 50 taxicabs at [Suburban], all but eight drivers had opted to become lessees. Effective August 7, 1977, [Suburban] ceased using commission drivers, and since that time has operated exclusively with lessee drivers. [Minneapolis] Yellow Taxi has continued to operate solely with commission drivers. [Suburban], based on its assessment that lessee drivers are independent contractors, rather than employees, has refused to apply the terms of its collective bargaining agreements to [Suburban's] lessee drivers and has refused to bargain about their terms and conditions of employment.

Brief for Respondent at 4–5 (citations omitted). The Board ruled that Suburban's lessees are employees and that Suburban's refusal to bargain with the Union thus constitutes a violation of sections 8(a)(5) and 8(a)(1) of the Act.

### A. The Operation of the Leasing Program

Drivers seeking leases from Suburban submit an application with references and a resume describing their driving experience. Those who are accepted sign a lease agreement and post a $100 to $250 bond, depending on the lessee's driving record.[5] Lessees are also required by the Airport, Blooming-

---

**3.** The Minneapolis-St. Paul Metropolitan Airports Commission was created as a "public corporation" with unique statutory powers by legislative act, Minn.Stat.Ann. § 473.603 (1977), and is considered to be a municipal corporation. *See* Harper, *The Minneapolis-St. Paul Metropolitan Airports Commission,* 55 Minn.L.Rev. 363, 376 (1971) (The structure, organization, powers and government of the Airport "are the envy of public airport management in other metropolitan areas."). It is governed by public commissioners appointed pursuant to statute, Minn.Stat.Ann. § 473.604; is empowered to exercise the power of eminent domain, *id.* § 473.608, subd. 2; and may borrow money and issue bonds. *Id.,* subd. 12. The Commission also holds title "in fee simple, absolute, unqualified in any way" to all the airport property. *Id.,* subd. 2. The Commission is authorized to "make, adopt and enforce rules, regulations, and *ordinances*" for achiev-

ing its purposes, "including those relating to the ... management and operation of [its] airports .... Any person violating any [Airport] ... rule, regulation, or *ordinance* shall be guilty of a misdemeanor." *Id.* subd. 17(1) (emphasis added). "[P]olicing and control" of the entire Airport is vested in the Commission. *Id.* § 473.621, subd. (2).

**4.** Citations to the official transcript of proceedings before the Administrative Law Judge (ALJ) are designated by "Tr." When citing to those passages from the transcript which are excerpted in the Joint Appendix filed by the parties to this petition, we have provided the parallel citation, *e.g.,* Tr. 150 (JA 295).

**5.** A copy of the lease (hereinafter "Sample Lease") is set out as an appendix to this opinion. JA 196–97.

ton and Richfield to pass a physical examination and to be licensed as cab drivers.[6]

### 1. *Types of Leases*

Suburban offers a wide variety of leases to applicant drivers. Drivers may contract for different periods ranging from eight hours, 24 hours, a weekend, or an entire week. Drivers may also extend their leases for extra hours. One newsletter to drivers described the range of available leases as follows:

> We now have lease rates available to suit everyone's needs:
>
> Day Lease from 6:00 a.m.-6:00 p.m.
>
> Short a.m. I Lease 6:00 a.m.-12:00 noon
>
> Short a.m. [p.m.] II Lease 12:00 noon-6:00 p.m.
>
> Dog Lease 12:00 mid-12:00 noon
>
> Dog Lease 12:00 noon-12:00 mid
>
> Extra Hours 3.00 hr.
>
> And our new Single Shift Lease 6:00 a.m. to 6:00 p.m. 24 hrs.
>
> Did you know that you can lease a fully equipped new Yellow Taxi with radio for $202.00 for the entire week? Why bother owning that second car, paying the insurance and maintenance on it, when you could be driving a fully insured, fully maintained Yellow for $202.00 a week?

Newsletter from J. Feldman, Suburban (undated) (JA 215).

Rates vary according to season and time of day. One announcement to drivers stated:

> The rates for fall are as follows:
>
> | | |
> |---|---|
> | Single shift | $35.00 per day, $202 per week |
> | Days | 25.00 per day |
> | Nights | 20.00 per night |
> | Weekend Special | 50.00 Saturday & Sunday |
>
> Remember, the more days you lease the smaller your rate is.

Letter from Minneapolis-Yellow to Lessees at 2 (Oct. 3, 1977) (JA 210).

A wider selection of leases can scarcely be imagined. The available rental periods vary greatly. Extra hours may be added. Suburban is not obligated to renew or extend the term of the lease. Lessees are not required to account for the amount of fares collected, Tr. 132 (J.A. 227), or to accept any calls other than those the lessee may agree to accept. Tr. 34 (JA 95). Drivers are not restricted to any particular area, required to stand at any specified place, or assigned any particular lease periods.

In return for the leasing fee, which is paid when the lease agreement is signed, the lessee receives a fully equipped, licensed cab furnished with a meter and radio dispatch equipment (and the right to use the radio dispatch service), liability insurance, tires, anti-freeze, free towing service within 50 miles of Suburban's garage, and repair service for all damages determined not to be the driver's fault and for all damages in excess of the driver's posted bond.[7] The cabs bear the logo "Suburban Yellow Taxi," and the driver obtains the right to use Suburban's name and good will. He may not change the trade name. Article 7 of the lease agreement provides:

> The relationship of employer-employee or principal-agent does not exist and is not intended to exist by either party to this lease. Instead, only a lease exists. Specifically:
>
> a. Lessee's compensation is not guaranteed. All income derived from the use of the Taxicab by Lessee is the sole property of Lessee.
>
> b. Lessee is at all times free from right of control and direction of Lessor in the operation of the Taxicab, or while the same is in Lessee's possession, and Lessor shall not exercise or attempt to exercise any supervision over the service performed by Lessee. Any rates of fare suggested by Lessor which are not regulated by law, ordinance or governmental rules or regulations are

---

**6.** *See* ALJ Decision, *supra* note 1, at 19 (JA 32); Tr. 24, 29–32 (JA 87, 90–93); Sample Lease, *supra* note 5 (JA 196–97); General Counsel's Exhibit Nos. 3, 4 (JA 198–201).

**7.** *See* ALJ Decision, *supra* note 1, at 19 (JA 32); Tr. 418–19 (JA 164–65); Sample Lease, *supra* note 5 (JA 196–97); Brief for Respondent at 6.

merely for the information of Lessee and Lessee is not obligated to charge such rates. [The municipalities regulate taxi cab rates].

c. Subject to compliance with [the law and existing regulations], Lessee shall not be required by Lessor to operate the Taxicab in any prescribed manner or accept any calls other than those which Lessee may of Lessee's volition agree to accept.

d. Lessee shall not be required to report the location or whereabouts of the Taxicab at any time during the lease period.

e. Lessee shall not be required to account to Lessor in writing or otherwise for any amounts collected from passengers. Lessee shall not be required to furnish Lessor any trip sheet or other record of Lessee's activities unless required by applicable law, ordinance or governmental rules or regulation, except for information relating to accidents or relating to the defense of any claims or suits against Lessor.

f. Subject to compliance with the provisions of [applicable law], Lessee shall not be restricted in any manner as to the area in which Lessee may operate the Taxicab.

g. Lessee shall not be required to have the Taxicab remain in any specified place or operated for any minimum number of hours during the lease term.

This agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and may not be modified except in writing signed by Lessee and an Officer of Lessor.

Sample Lease, *supra* note 5, at 1 (JA 197). In addition, lessees may use the cab for pleasure and for personal business. *See* Tr. 186, 285 (JA 124, 147); Sample Lease, *supra* note 5, ¶ 7b (JA 197).

**8.** Minneapolis-Saint Paul Metropolitan Airports Commission, Ordinance No. 50 (1977) (JA 235–256) (hereinafter the "Airport Ordinance").

**9.** Minneapolis-Saint Paul Airports Commission, Special Regulation No. 46 (1977) (JA 257); *see* Sample Lease, *supra* note 5, ¶ 1(a) (JA 196).

## 2. *Radio, Airport and Contractual Business*

Suburban is licensed in six municipal jurisdictions: The Airport, Bloomington, Richfield, Edina, Eden Prairie and Burnsville. "Lessees are free to prospect for fares independently," Brief for Respondent at 9, but the vast majority of their business is obtained by radio communication from the radio facility of parent Minneapolis Yellow in downtown Minneapolis. The radio facility communicates with both Suburban's lessees and Minneapolis Yellow's commissioned drivers. Unlike commissioned drivers, a lessee may refuse "runs" offered over the radio, Tr. 34, 285 (JA 95, 147), but once he accepts a run he must complete it. ALJ Decision, *supra* note 1, at 25 (JA 38). Lessees are encouraged to keep their radios on at all times, but they are not required to do so. Tr. 186, 215, 246 (JA 124, 130, 141). Two drivers testified that they obtained 70 to 80 percent of their business from radio calls. Tr. 184, 238 (JA 122, 140).

The Airport is located immediately adjacent to or close by the suburban municipalities in the area where Suburban's cabs operate, and undoubtedly it is the source of a substantial proportion of Suburban's business. The Airport has a detailed regulatory Ordinance requiring the licensing of cabs and prescribing strict procedures for the operation of taxis at the Airport terminal.[8] The Ordinance regulates parking, traffic flow, and the loading of passengers and baggage by all vehicles used for public conveyance within the Airport. Airport Ordinance, *supra* note 8, ¶ 11.2 (JA 249–50). An Airport "starter" "is designated by the Metropolitan Airports Commission to call up taxi cabs from the taxi stand to any point which is designated for the purpose of picking up passengers or baggage."[9] The starter is an employee of the Airport—not Suburban.[10] Under the Ordinance, the Air-

**10.** An employee of Suburban assists in those baggage calls at the Airport which are arranged pursuant to contract with various airlines. Tr. 36 (JA 97); *see* note 25 *infra.*

port starter exercises general supervision over the taxi stand area and over the pick-up and discharge of passengers and baggage at the Airport. *Id.* ¶¶ 11.2–11.4 (JA 249–55). The Ordinance provides that drivers may move out of line to pick up passengers in response to specific calls or for business for which Suburban has contracted for with other companies. *Id.* ¶ 11(a), (b), (d) (JA 250).

Suburban has contracted with between 25 and 30 local corporations to furnish transportation, usually for packages, at flat rates which are agreed upon between the parties. *See, e.g.,* Control Data Corporation (bulletin) (JA 207) (listing agreed fees for runs for Control Data Corporation). For runs not on the agreed fare list, meter fees are charged on a "most-direct-route" basis, as one might expect. Cabs are not authorized to operate otherwise. A number of airlines also have contracted with Suburban for transportation of baggage (usually delayed baggage of airline customers) from the Airport. Drivers are not obligated to accept such baggage runs when proffered and may refuse them.[11] If a driver accepts a business run, however, he is bound by the agreed fee (or the meter rate) and, upon pain of losing the opportunity to make such runs, he may not do business individually with such contract customers. Overcharges by drivers on such runs are determined by Suburban, which then exacts restitution from the driver and reimburses the customer. If a driver refuses to make restitution Suburban may refuse renewal of his lease. The same procedure is followed when lessees fail to deliver packages, lose them, or deliver them to an incorrect address. *See* ALJ Decision, *supra* note 1, at 23 (JA 36). Runs made pursuant to flat-rate and airline baggage contracts constitute only about

five percent of the drivers' total business. Tr. 430–31 (JA 170).

### 3. Trip Sheets

"Trip sheets" or "log sheets" are forms on which cab drivers record their activities, showing the date, cab number, lessee number, number of passengers, the origin and destination of each trip, and the time the trip begins and ends. Brief for Respondent at 12–13; *see* General Counsel's Exhibit No. 12 (JA 208) (sample trip sheet). Regarding trip sheets, the lease provides as follows:

> Lessee shall *not* be required to account to Lessor in writing or otherwise for any amounts collected from passengers. Lessee shall not be required to furnish Lessor any trip sheet or other record of Lessee's activities unless required by applicable law, Ordinance or governmental rule or regulation . . . .

Sample Lease, *supra* note 5, ¶ 7e (JA 197) (emphasis added). Testimony indicates that the Airport and the municipalities of Bloomington and Richfield require drivers to keep trip sheets, to file them as part of the driver's record, and to open them to inspection by police officers.[12] Suburban's trip sheets do *not* require drivers to report fares. *See* General Counsel's Exhibit No. 12 (JA 208) (sample trip sheet).[13]

### 4. The Working Cab Driver

The Board recognizes that "lessees are generally free from direct supervision while they are on duty," but asserts that supervisors of parent Minneapolis Yellow, whose duties are chiefly directed at Yellow's commissioned drivers, "occasionally" make spot checks to ensure that a Suburban cab is not being subleased. Brief for Respondent at 13. Supervisors also may report incidents of speeding to Suburban. *Id.;* Supplemental Decision and Order of the NLRB, 262

---

**11.** ALJ Decision, *supra* note 1, at 25 n. 49 (JA 38); *see* Sample Lease *supra* note 5, ¶ 7c (JA 197) (lessee not required to "accept any calls other than those which Lessee may of Lessee's volition agree to accept").

**12.** *See* Tr. 56, 211, 229, 443, 456 (JA 105, 128, 133, 174, 181).

**13.** The Airport and Richfield Ordinances provide for the reporting of fares. *See* Ordinance Code, City of Richfield, ¶ 6.21, subd. 11 (1977) (JA 268–69); Airport Ordinance, *supra* note 8, ¶ 11.17 (JA 253). However, the testimony does not indicate that fares were reported. *See* note 12 *supra.*

NLRB No. 89, at 7 (1982) (JA 64). Suburban also has issued bulletins suggesting courtesy to passengers,[14] prescribing the manner of handling accidents,[15] and stressing the importance of being prompt.[16] Drivers may be *offered* flower runs, and if a run is assigned, they are told not to dispute or refuse it.[17] Drivers are also warned against falsifying their locations when reporting their positions;[18] not to congregate at certain locations, as this might cause the withdrawal of authority to use the cab stand;[19] not to leave their cabs unattended if parked at a cab stand;[20] and to keep down mileage.[21] Other bulletins describe how to collect for certain package runs,[22] remind drivers that airline baggage runs are to be run on the meter over the shortest possible route,[23] and suggest that watching mileage instead of the gasoline gauge might be a better way to avoid running out of gasoline.[24]

### 5. *Termination of Leasing Privileges*

Suburban may deny leases to drivers for a variety of legally based reasons, including driving while intoxicated and violating radio regulations of the Federal Communications Commission. Leases may also be terminated for "driver dishonesty," refusal to reimburse overcharges, nondelivery of goods, sleeping at cab stands, falsifying cab location, making independent arrangements with contract customers, and for conduct detrimental to Suburban's good will and trade name, including customer complaints.

## II. THE BOARD DECISION

### A. *The Original Decision*

In *Seafarers, supra,* we held that certain cab drivers in Chicago and environs, who operated under a parent corporation of Suburban, were independent contractors and not employees subject to the Act. As the Board concedes, Brief for Respondent at 22, Suburban's lease is virtually identical to the lease at issue in *Seafarers.* Tr. 23 (JA 86). However, notwithstanding that the ALJ found the facts here to be "not materially distinguishable" from those presented in *Seafarers,* he concluded that Suburban's drivers are employees. In a two-to-one decision, the panel affirmed the ALJ's decision. 249 N.L.R.B. 265 (1980) (JA 2). In that decision, without undertaking any substantial analysis of its own, the panel majority stated:

> We agree with the Administrative Law Judge's analysis and finding that the taxi cab drivers herein are employees within the meaning of the Act. As additional support, see our recently issued decision in *Air Transit, Inc.* 248 NLRB No. 140 (1980).[25]

249 N.L.R.B. at 265 n. 2 (JA 3).

As a result, the majority also held that Suburban had committed unfair labor prac-

---

**14.** Bulletin: *Courtesy,* General Counsel's Exhibit No. 9 (JA 202).

**15.** Bulletin: *Personal Duties in Case of an Accident,* General Counsel's Exhibit No. 9 (JA 203).

**16.** *E.g.,* Bulletin: *Delayed Airport Luggage,* General Counsel's Exhibit No. 9 (JA 204).

**17.** *See* Bulletin: *Bachman's,* General Counsel's Exhibit No. 9 (JA 205).

**18.** Bulletin: *Radio Procedure,* General Counsel's Exhibit No. 9 (JA 206).

**19.** *See* Tr. 57–58 (JA 106–07).

**20.** Brief for Respondent at 14.

**21.** Letter from Minneapolis Yellow to Lessees at 1 (Oct. 3, 1977) (JA 209).

**22.** Control Data Corporation (bulletin) (JA 207).

**23.** Memorandum from Suburban Management to All Suburban Lessees (Mar. 29, 1977) (JA 222).

**24.** Memorandum of June 6, 1977 (JA 223).

**25.** Shortly after the Board issued its *Suburban* decision, another NLRB case involving the same taxi drivers as those in the *Air Transit* decision relied on by the Board reached the 4th Circuit and was reversed, the court holding that Air Transit's cab drivers were *not* employees. *Air Transit, Inc. v. NLRB,* 679 F.2d 1095 (4th Cir.1982). Thus, the only authority relied upon by the panel for its conclusion that Suburban's lessees are employees was reversed by the Court of Appeals.

tices in violation of section 8(a)(5) and (1) of the Act. The Board ordered Suburban to

recognize and bargain with the Union as the exclusive collective-bargaining representative of the lessee drivers *employed* at its Suburban facility in Richfield, Minnesota, ... and that it apply ... such terms of its governing collective-bargaining agreements as may be relevant to the lessees. Respondent will also be required to bargain with the Union concerning any other terms and conditions of the lessees' employment deemed pertinent, and to embody in a signed understanding any agreement reached with the Union.

*Id.* at 266 (JA 5–6) (emphasis added).

Member Panello dissented from the majority's disposition

on the ground that the lessee drivers are independent contractors rather than statutory employees. Both my colleagues and [Suburban], in its brief, agree that *the facts here are not materially distinguishable from those present in [Seafarers]*, in which I dissented from the Board's decision to find certain taxi drivers to be employees within the meaning of the Act. My review of the record confirms their assessment [that the facts here are not materially distinguishable from those present in *Seafarers*]. Therefore, I dissent in this case for the same reasons I dissented in *Yellow Cab.*

*Id.* at 267 (Panello, dissenting in part) (JA 10–11) (emphasis added).

### B. *The Board's Supplemental Decision and Order*

Shortly after the panel's decision in *Suburban,* we announced our decision in *City Cab Co. of Orlando, Inc. v. NLRB,* 628 F.2d 261 (D.C.Cir.1980) (contract with the drivers was designated as a "sale of services"). In *Orlando* we distinguished *Seafarers* on factual grounds, and held that the Orlando drivers were employees rather than independent contractors. Shortly thereafter, the full Board reconsidered the panel's *Suburban* decision in light of *Orlando* and, sua

*sponte,* issued a Supplemental Decision and Order confirming its earlier ruling by a three-to-two vote. 262 NLRB No. 89 (1982) (JA 58). The Board's plurality opinion[26] proceeds in the main from the premise that our decision in *Orlando* justifies *reversing* the panel's prior finding that the facts in *Suburban* are "not materially distinguishable" from those in *Seafarers;* the plurality termed the prior finding "unwarranted." *Id.* at 3 n. 2 (JA 60). Two members dissented on the ground that the lessees were independent contractors, since the case presented facts indistinguishable from those in *Seafarers. Id.* at 17–22 (JA 74–79) (Van de Water, Chairman, dissenting); *id.* at 23 (JA 80) (Hunter, dissenting).

Suburban has petitioned for review, and the Board has cross-petitioned for enforcement.

### III. ANALYSIS

#### A. *The Right-to-Control Test*

This case is controlled by our decision in *Seafarers,* and we adopt by reference the relevant analysis therein.

In 1947, Congress specifically exempted independent contractors from the coverage of the Act:

[W]hen used in this Act ... the term "employee" ... shall not include ... any individual having the status of an independent contractor ....

61 Stat. 140 (1947), *codified at* 29 U.S.C. § 152(3) (1976). The legislative history of the amendment creating this exemption is set forth in *Seafarers, supra,* 603 F.2d at 904–07, and in *NLRB v. United Insurance Co.,* 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968).

■ The right-to-control test by which the Board and the courts distinguish between these two types of workers requires a "totality of the circumstances approach," and no one factor is determinative. *Seafarers, supra,* 603 F.2d at 872–73 (citing *Frito-*

---

**26.** Only two of the Board's five members concurred in the opinion. Member Zimmerman wrote a concurring opinion in which he expressed his disagreement with our *Seafarers* decision. 262 NLRB No. 89, at 11–16 (JA 68–73) (Zimmerman, concurring).

*Lay, Inc. v. NLRB,* 385 F.2d 180, 187 (7th Cir.1967); *NLRB v. A.S. Abell Co.,* 327 F.2d 1, 4 (4th Cir.1964); *News Syndicate Co.,* 164 N.L.R.B. 422 (1967)). Nonetheless, the most important factor to be considered is the extent of actual supervision exercised by a putative employer over the "means and manner" of the workers' performance. *Seafarers, supra,* 603 F.2d at 873; *Lodge 1858 v. Webb,* 580 F.2d 496, 505 (D.C.Cir. 1978).

Despite the apparent amorphousness of the test, however, we drew attention in *Seafarers* to certain "crucial factors" that outweigh characteristics of "minor importance." 603 F.2d at 878. Of particular relevance to the facts of the present case, we remarked:

> When a driver pays a fixed rental, regardless of his earnings on a particular day, and when he retains all the fares he collects without having to account to the company in any way, there is a strong inference that the cab company involved does not exert control over "the means and manner" of his performance. This conclusion is justified because under such circumstances, the company simply would have no financial incentive to exert control over its drivers, other than such as is necessary to immunize the proprietor of a cab from liability which arises from its operation by virtue of the lessor's ownership. However the driver conducts his occupation, the company has received its financial reward and the cab driver's self interest in the success of his venture and the municipal regulations are some assurance that the cab service will continue to be attractive to customers.

*Id.* at 879 (quoted with approval in *Air Transit, Inc. v. NLRB,* 679 F.2d 1095, 1099 (4th Cir.1982)). Although these same "crucial factors" exist in *Suburban,* the Board majority has stated that "the reality of the situation convinces us that [Suburban] retain[s] not only control over the result to be achieved, but also the means by which that result is effected." 262 NLRB No. 89, at 3 (JA 60).

Our task on review, therefore, is to determine whether the record contains evidence of control sufficient to overcome the "strong inference" which arises from the financial incentives created by the economic realities of the leasing operations. The Board claims to have discharged this heavy burden by identifying facts that distinguish *Suburban* from *Seafarers.* To this end, it principally relies on factors weighed in our recent *Orlando* opinion. The Board has misinterpreted our *Orlando* decision.

### B. *The* Orlando *Decision*

In *Orlando* we held that cab drivers were employees where they operated under a twelve-month contract, which the company styled a "sale of services" to the driver rather than a lease. As in the present case, the *Orlando* contract recited the parties' intention not to create an employment relationship and avowed that drivers were to work free from interference or control by the company. We pointed out, however, that in practice certain controls imposed on the manner in which the drivers performed their duties created a *de facto* employment relationship. We adverted to five basic control factors as indicating that an employment relationship existed. The Board contends the same five factors justify its refusal to apply *Seafarers* to *Suburban.* We consider each in turn below.

### 1. *Trip Sheets*

Unlike the drivers in *Seafarers,* the *Orlando* drivers were required by the company to maintain trip sheets that chronicled "each driver's movements and *fares.*" 628 F.2d at 264 (emphasis added). And in *Orlando,* the trip sheet was required by the *owner* in its own interest. Here, as previously noted, *ordinances* of the Airport, Bloomington and Richfield require the maintenance of trip sheets, but fares are not reported on the trip sheets.[27] Courts have consistently held that regulation imposed by governmental authorities does not evidence employer control. *See, e.g., NLRB*

---

27. *See* notes 12–13 *supra.*

*v. Associated Diamond Cabs, Inc. (Diamond Cabs),* 702 F.2d 912 (11th Cir.1983); *Air Transit v. NLRB, supra,* 679 F.2d at 1100; *Seafarers, supra,* 603 F.2d at 875–76. The Eleventh Circuit recently reached the same conclusion regarding ordinance-mandated trip sheets. *Diamond Cabs, supra,* 702 F.2d at 921–922, 923.

The Board rejoins that, because Suburban imposes a trip sheet requirement *"far in excess* of that necessary for lessees to comply with applicable law," the company has transformed a requirement by three municipalities [28] into a blanket rule that trip sheets be kept for all trips. 262 NLRB No. 89, at 3–4 (emphasis added) (JA 60–61). In overestimating the sweep and significance of the blanket rule, the Board's rejoinder falls short for two reasons. First, given the geographical configuration of the relevant municipalities, most of Suburban's business undoubtedly originates at, terminates in, or passes through highways in the Airport, Bloomington, or Richfield. An examination of the official map of Minnesota, of which we take judicial notice,[29] reveals that the other three communities in Suburban's service area are adjacent to, and most of the principal highways cut across the borders of, Bloomington, Richfield and the Airport. Almost 60 percent of the inhabitants of the area serviced by Suburban reside in Bloomington and Richfield, *see* pages 367–368 *supra,* and, in addition, runs to and from the Airport must constitute a very substantial portion of the business of any taxi company in the area. Thus, most taxi runs probably would *touch upon* the Airport or a municipality that requires trip sheets—even those

runs that might originate or terminate in other communities. In such circumstances, Suburban's log sheet requirement is a relatively minor, reasonable precaution taken to ensure strict compliance with applicable law.

Second, and more to the point, the Board adverts to nothing in the record which suggests that Suburban makes any use of the trip sheets. Nor has our own examination of the record unearthed any such evidence. The Board's conclusion appears to rest on its observation that sheets are to be turned in to "the Suburban garage" rather than to the municipality requiring the records. Brief for Respondent at 23; *see* General Counsel's Exhibit No. 12 (JA 208) (sample trip sheet) ("Sheet Must Be Turned Into The Suburban Garage In Accordance With City Ordinance"). But this is not evidence that Suburban makes any use of the sheets to control operations; rather, it is a service for ensuring compliance with municipal requirements. *See* Tr. 443 (JA 1974) (testimony of Jeffrey M. Feldman, President, Minneapolis Yellow Taxi Company, Inc.) (Suburban supplies blank trip sheets to its lessee drivers *"at their request* free of charge so that le[ssee] drivers can record their starting, their pickups and their drop offs as it states in accordance with city ordinances.") (emphasis added). Nor has the Board made any finding that such use was made; in fact, the Board appears now to rely on the company's failure to come *forward* with allegations that it makes no use of the information.

---

28. As noted, the Airport has the same status as a municipal corporation. *See* pages 367–368 & n. 3 *supra.*

29. Judicial notice may be taken of facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). As a document "bearing a seal purporting to be that of . . . any State," the map is a self-authenticating document under Fed.R. Evid. 902(1) and a source whose accuracy cannot reasonably be questioned. The propriety of taking such notice on appeal is well established. *See, e.g., Government of Canal Zone v. Burjan,* 596 F.2d 690, 693–94 (5th Cir.1979)

(appellate court taking judicial notice of geographical boundaries of Canal Zone by resort to certified maps); *Ives Laboratories, Inc. v. Darby Drug Co.,* 638 F.2d 538, 544 n. 8 (2d Cir.1981); Model Code of Evidence Rule 806, Comment (1942) ("[B]oth the trial judge and the reviewing court should be free to exercise sound discretion" in taking judicial notice.); 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 201[06], at 201–48 (1982) ("[J]udicial notice is permissible on appeal even if it had not been urged below . . . ."). The geographical boundaries of Suburban's service area and its municipalities were obviously well known to the parties at the hearing.

*See* Brief for Respondent at 23 n. 4. Reasonable efforts to ensure compliance with governmental regulations do not evidence control "unless pervasive control by the employer exceeds to a significant degree the scope of the government control." *Diamond Cabs, supra,* 702 F.2d at 922; *accord Air Transit, Inc. v. NLRB, supra,* 679 F.2d at 1100; *Seafarers, supra,* 603 F.2d at 875–76; *NLRB v. Cement Transport, Inc.,* 490 F.2d 1024, 1027 (6th Cir.1974), *cert. denied,* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *SIDA of Hawaii, Inc. v. NLRB,* 512 F.2d 354, 359 (9th Cir.1975); *NLRB v. Deaton, Inc.,* 502 F.2d 1221, 1226–28 (5th Cir. 1974), *cert. denied,* 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975); *Local 814, I.B.T.,* 223 N.L.R.B. 752, 753, *enforcement ordered,* 546 F.2d 989 (D.C.Cir.1976); *Portage Transfer Co.,* 204 N.L.R.B. 117 (1973); *Reisch Trucking & Transportation Co.,* 143 N.L.R.B. 953 (1963). Since the record is devoid of evidence of "pervasive control" that "significant[ly]" exceeds the scope of government control, the trip or log sheets do not support a finding of substantial employer control.

### 2. *Regulation of Hours*

■ The *Orlando* court found that the company significantly regulated the drivers' hours, largely by closing its central office for three hours during the middle of the day and by assigning cabs on a first-come, first-served basis. 628 F.2d at 265. There is no similar evidence here that Suburban closes its garage, and the wide variety of leases offered, *see* pages 368–369 *su-*

*pra,* precludes the possibility of exerting control by assigning cabs on a first-come, first-served basis. In fact, the ALJ in *Suburban* found that freedom to choose one's own hours distinguished lessee and commissioned drivers:

> There are no minimum performance standards or hours of work set for lessees as there are for commission drivers, who, alone, punch time cards and may be disciplined and ultimately discharged for not meeting minimum standards in terms of both revenue per mile and per shift. Detailed records are kept of the performance of commission drivers on driver performance cards. Commission drivers normally work a 9½ hour shift which may reach 11 hours in times of emergency. There are no limits on the hours lessees may work.

ALJ Decision, *supra* note 1, at 27 (JA 40) (footnote omitted).[30] Finally, Suburban's drivers may add extra hours to any lease period by paying $3 for each additional hour. *See* Newsletter from J. Feldman, Suburban (undated) (JA 215). Unlike *Orlando,* therefore, Suburban does *not* significantly regulate its drivers' hours.

### 3. *Passenger Selection*

The Orlando cab company substantially controlled the passenger selection of its drivers through its own system of airport "starters" and by means of its radio dispatch system. 628 F.2d at 264–65.

■ Because, pursuant to ordinance, the starters at issue in the present case are

---

**30.** In a footnote to the quoted passage, the ALJ qualified his finding by asserting that *"[d]e facto* work hours are, in effect, set for lessees as [Suburban] starts its 12 and 24-hour leases at 6 a.m., and, accordingly, its 12-hour night leases at 6 p.m." ALJ Decision, *supra* note 1, at 27 n. 54 (JA 40). We rejected an almost identical argument in *Seafarers:*

> The Board finds control of the lessees in the companies' "use of day and night leases (i.e., *those of less than 24-hour duration)"* whereby it argues the companies "are able to prescribe the hours of work." This argument conveniently overlooks that leases are available for "24 hour[s]" and "for 2 days at a time, or 3 days on weekends ..." *Moreover, the term of the lease whether for 12 hours or 3*

> *days does not authorize the company to control the lessee in the manner in which he operates his cab.* At most, it could furnish an opportunity for the companies to exercise some indirect control, but since there is no evidence that the companies use the threat of nonrenewal to exercise pervasive control over the manner and means in which drivers conduct their business, the provision in the lease does not furnish any support for the conclusion that the drivers are employees.

603 F.2d at 899 (emphasis added) (footnotes omitted). Here, there is even greater flexibility in hours than was present in *Seafarers,* as leases are available for 24 hours, weekends, entire weeks, or for extra hours. *See* page 368 *supra.*

employed by the *Airport,* not Suburban, *see* page 369 *supra;* Tr. 422, any control exerted by starters cannot support a finding that *Suburban* controls the conduct of its lessee drivers' day-to-day operations.[31] *See, e.g., Diamond Cabs, supra,* 701 F.2d at 921–922 ("[R]egulation imposed by governmental authorities does not evidence control by the employer."). In its Supplemental Decision, however, the Board stated that

It is possible for the mandatory legal requirement to become so detailed, and consequently bind the parties so closely together operationally, that *compliance prevents the existence of an independent contractor relationship, and rather ensures that of employer-employee.*

262 NLRB No. 89, at 5 (JA 62) (emphasis added). The Board cites no authority for this proposition. Nor is that this case. The ordinances here do not destroy the basic freedom of the drivers to operate their businesses independently. The Airport's use of starters, therefore, cannot support the Board's decision.

With respect to the radio dispatch system, Suburban's lessees are free to refuse any radio call. The ALJ made the following finding:

[C]hief Dispatcher James Le Tourneau testified that under [Suburban's] policy, lessees are free to refuse orders for runs, without penalty, and dispatchers are so instructed. Le Tourneau's testimony, corroborated by . . . [Suburban's] witnesses, including lessees Bruce Stein and Robert Pace, comports with the weight of the evidence, and *is credited.*

ALJ Decision, *supra* note 1, at 25 n. 49 (JA 38) (emphasis added). This is in marked contrast to the circumstances in *Orlando,* in which drivers lacked the freedom to reject calls assigned by the dispatcher. In that case, the owner "candidly and tellingly"

threatened to refuse to rent cabs to drivers who refused calls. 628 F.2d at 265. There is no evidence that Suburban made threats not to renew leases to drivers who refused radio calls. Moreover, that drivers sometimes do choose to forego business by refusing to respond to radio calls, *see* ALJ Decision, *supra* note 1, at 25 n. 49 (JA 38), evidences independence. *See Diamond Cabs, supra,* at 923–924. We conclude, therefore, that the record as a whole does not contain substantial evidence to support the Board's finding that the company uses its radio dispatch system to exert control over the drivers.

### 4. *Goodwill*

■ In *Seafarers* we observed that the compensation (rent) received by the company for the lease of its cabs was not related to the amount of fares collected by the drivers. 603 F.2d at 880–81. In *Orlando,* on the other hand, we found that the company closely monitored fares chronicled on trip sheets and, on that basis, had changed the financial details of the drivers' lease arrangement seven times in six months. Thus, because the company's compensation was effectively tied to the revenues generated by the drivers, we concluded, upon consideration of all the circumstances, that the "goodwill" of the enterprise inured to the Orlando company, not to the drivers. 628 F.2d at 265.

The Board contends that Suburban also adjusts its leasing rates in relation to the drivers' total revenues:

Respondent has experimented with several different types of leases, and has unilaterally changed the financial terms of the lease arrangement. These unilateral changes, coupled with [Suburban's] ability, through the trip sheets, flat rate agreements, airport delivery rates, and charge slip system,[32] to monitor a driv-

---

**31.** Suburban does station an employee at the Airport to act as an "airport limousine starter." Tr. 36 (JA 97). Since those of his duties which are relevant to this case pertain only to baggage runs undertaken pursuant to contracts with the various airlines, his function can support no inference respecting control of *passenger* selection. Cases holding that contractual

arrangements like those between Suburban and the airlines do not evidence employer control are set forth *infra* at page 379.

**32.** Charge slips are chits given to drivers in lieu of cash for deliveries made for Suburban's contract customers. *See* ALJ Decision, *supra* note 1, at 25 (JA 38).

er's overall business, *suggest that [Suburban's] standard rental fees may be directly related to, and vary according to, the total volume of business generated by the lessees.* 262 NLRB No. 89, at 7–8 (JA 64–65) (emphasis added) (footnote omitted). The record does not support this assertion. As the underscored language indicates, the Board's assertion is weak. The Board did not find that Suburban *in fact* adjusts lease rates in relation to total receipts. Instead, the Board only infers the "suggest[ion]" that such adjustment "may" take place. In *Orlando,* on the other hand, we premised our finding that goodwill inured to the company on an *actual* practice of making adjustments, not on the potentiality for doing so. *See* 628 F.2d at 265.

Even the Board's tentative inference is unfounded, since virtually all of the procedures the Board views as conducive to the monitoring of drivers' total receipts are unrelated to the vast bulk of the drivers' business. The record shows that 95 percent of a driver's total business is derived from meter rates set by municipalities; only five percent is derived from flat-rate agreements and airline baggage deliveries. *See* Tr. 430–31 (JA 170). As to trip sheets, we have already noted that there is no evidence that Suburban makes any use of them whatsoever. *See* pages 373–374 *supra.* The Board has not demonstrated that Suburban's rental income is tied to the drivers' total revenues. *See Blue Bird Cab Co.,* NLRB No. 5–RD–811, slip op. at 11 (June 10, 1983) (To the extent rental fees "are not a percentage of the fares collected by drivers, . . . the [putative] Employer does not receive the benefits of any 'goodwill' created by the driver.").

Moreover, there is evidence in the record to suggest that drivers are able to create goodwill that inures to them personally. One driver testified that 30 percent of his business was derived from patrons who called for his own, personal services. *See* Tr. 294 (JA 149). That drivers "are free to make their own arrangements with clients and to develop their own goodwill" mili-

tates in favor of finding them substantially independent in their operations. *SIDA of Hawaii, Inc. v. NLRB, supra,* 512 F.2d at 357–58.

Of course, both parties to the working relationship derive benefit from the goodwill created by the entire Suburban operation. Goodwill is a two-way street in any independent-contract relationship that possesses, as this one does, some of the features of a franchise (*e.g.,* a company logo, company advertising, and a centralized radio dispatch system). But this is not the precise sense in which we spoke of goodwill in our *Orlando* decision. Rather, we were there concerned solely with the practice of varying rental rates on the basis of drivers' total amounts of business. Such a practice might suggest that the leasing fees charged are actually commissions disguised as "rents." There is no evidence that such evasion takes place in the present case.

### 5. Dress Code

The company in *Orlando* prescribed an elaborate dress code for its drivers, 628 F.2d at 265, in sharp distinction to the situation in *Seafarers,* where drivers were expected only to be neat and clean, and not to wear sandals. *See Seafarers, supra,* 603 F.2d at 868, 902. In the present case, moreover, Suburban neither establishes nor enforces any dress code at all. After describing Minneapolis Yellow's comprehensive dress code for commissioned drivers, the ALJ concluded: "I find that lessees . . . are not subject to dress and grooming codes . . . ." *See* ALJ Decision, *supra* note 1, at 27 (JA 40).

\* \* \*

As the foregoing demonstrates, not a single one of the five factors we relied on to distinguish *Orlando* from *Seafarers* has any dispositive force, singly or cumulatively, in the present case. Consequently, *Orlando* does not provide a basis upon which to reverse as "unwarranted" the Board's prior determination that the facts of *Suburban* and *Seafarers* are "not materially distinguishable." *See* ALJ Decision, *supra* note 1, at 23 (JA 42); 249 N.L.R.B. at 265 n. 2

(JA 3); 266 NLRB No. 89, at 3 n. 2 (JA 60). Nor are we persuaded that additional factors cited by the Board, to which we now turn, "manifest an employer-employee relationship." 266 NLRB No. 89, at 6 (JA 63).

### C. Additional Factors Asserted by the Board

The Board's plurality opinion strings together a number of minor factors as indicative of employee status. We find none of them individually or collectively convincing. Some are irrelevant under the case law; others are insubstantial or unsupported by the record. They are, in short, "gnats [which] were swatted away by [our *Seafarers* decision]." *Diamond Cabs, supra,* 702 F.2d at 924. Nonetheless, we consider each in turn.

#### 1. Subleasing

With respect to provisions prohibiting subleasing, we stated in *Seafarers:*

Technically, [the prohibition of subleasing] is a restriction, but it is not evidence of pervasive employer control over the means and method by which the lessee does his job. It is merely an exercise of normal business caution to contract with responsible people.

603 F.2d at 901.

The lessee here "certifies ... to be the sole driver of the leased vehicle." Sample Lease, *supra* note 5, ¶ 2b (JA 196). Suburban's municipal licenses may be revoked if unauthorized drivers operate its cabs and the lease provision reasonably seeks to avoid that hazard. The lessor, moreover, has an interest in minimizing exposure to liability resulting from the use of unlicensed and unqualified drivers. Attempting to guarantee that a responsible, licensed and approved driver carries out his personal contract does not evidence pervasive control of the details of the lessees' operation of his cab. *See also Diamond Cabs, supra,* at 920–921.

#### 2. Mileage

The Board plurality asserts that Suburban enforces a mileage limitation. 262 NLRB No. 89, at 7 (JA 64). The record, however, shows only that lessees are requested to minimize mileage. It cannot be contended that this suggestion for economical operation is evidence of pervasive control. *See Seafarers, supra,* 603 F.2d at 902 (250-mile limit). And a request is not an order or an instruction.

#### 3. Determination of Fault

Suburban's determination of fault in accidents likewise in no way restricts or controls the manner in which the driver operates his taxi business. On this point we remanded in *Seafarers:*

[Company determination of fault] is a minor example of company control over a business decision, but is not evidence of pervasive control. That the decision as to who is *legally* at fault in an accident is made in this way does not support the claim that the Company controls the means and methods by which the lessee conducts his operation.

603 F.2d at 902 (footnote omitted). *See also Diamond Cabs, supra,* 702 F.2d at 916–917. Moreover, a *post hoc* determination is unlikely to influence day-to-day operations.

#### 4. Speed Warnings

The Board contends that Suburban "lessees have been *warned* not to speed." Brief for Respondent at 24 (emphasis added). Speeding violates the law. The driver has agreed "to comply with ... all applicable laws, ordinances and governmental rules and regulations ...." Sample Lease, *supra* note 5, ¶ 2a (JA 196). Obviously, drivers are obligated to comply with laws and ordinances against speeding, even in the absence of any such warning or provision in the lease. Moreover, the ALJ did not find, and the record contains no evidence, that Suburban ever penalized a lessee for speeding. Cautions issued regarding compliance with state laws and ordinances are not indicative of control by the lessor and thus do not evidence an employer-employee relationship. *Diamond Cabs, supra,* at 921–922, 923; *Air Transit, Inc. v. NLRB, supra,* 679 F.2d at 1098. In *Seafarers,* we called atten-

tion to NLRB and circuit court decisions holding that requiring compliance with governmental regulations does not evidence employee status. 603 F.2d at 876.

### 5. Bulletin Board Notices

There is no finding or evidence in the record that any lessee has ever been penalized for ignoring or failing to follow any suggestion or request which appeared on the bulletin board. The notices reminded drivers of pertinent municipal regulations, lease conditions, company policy concerning the leasing program, courtesy, accident procedures, handling of delayed airport luggage, procedures for flat-rate runs, and radio procedures. To whatever extent these might be styled "controls," they fall into that category of "standards of conduct to which all of the drivers should adhere in order to support the [company] image for the mutual benefit of [Suburban] and its drivers." *SIDA of Hawaii, Inc. v. NLRB, supra,* 512 F.2d at 358–59.

### 6. Investment in Cabs

The Board's assertion that drivers have no equity in their cabs is irrelevant. That a driver does not own his own cab, or the possibility that he may not be reassigned the same cab or any cab, has nothing to do with the manner in which he operates his business under the Suburban logo on a day-to-day basis. In *Seafarers* we rejected the argument that, since the lessee does not own the cab, he cannot be an independent contractor. Furthermore, we remarked that,

> over the course of a year, a lessee will invest close to $7,000 in lease payments for the car and additional sums in the necessary gas and oil. This sum of money, paid daily, cannot be considered as anything less than a substantial investment—though the lessee never acquires title to the cab. The sums thus paid appear to be roughly equivalent to what a driver would invest if he were purchas-

ing the cab—though he gets more than just the cab. These facts contradict the Board's decision which states "the lessee drivers have *no investment* in the instrumentalities of their work."

*Seafarers, supra,* 603 F.2d at 898 (emphasis in original) (citation omitted).[33]

The $202 weekly leasing fee paid to Suburban over 50 working weeks constitutes an annual investment of $10,000, excluding the cost of gasoline. Drivers who make such a sizeable investment are not to be characterized as employees who make no entrepreneurial contribution and take no financial risk in their work. Suburban's lessees clearly work for profits.

### 7. Permanent Working Relationship

The Board's plurality also asserts that finding an employee relationship is supported because

> lessees have a *permanent working relationship* with the company, under which they may continue as long as their performance is satisfactory. We do not believe that the short term aspect of the leases intimates otherwise, for in reality leases are denied only when [Suburban] unilaterally decides that a lessee's performance is unsatisfactory.

262 NLRB No. 89, at 8–9 (JA 65–66) (emphasis added). On the other hand, Board Member Zimmerman in his concurring opinion indicates he holds a contrary view. He contends that a long term lease is indicative of independent contractor status: a "substantial investment in the cab (such as a long term lease) should be highly indicative of an independent contractor relationship." *Id.* at 16 (Zimmerman, concurring) (JA 73). The ALJ made no finding on this point.

The wide variety of available leases speaks for itself. Moreover, it is *control,* or the lack thereof, exercised while the cab is in the driver's possession, not the length of the leases, that primarily determines the status of the driver. The taxicab business is renowned for its high rate of turnover.

---

**33.** The Board has also, inconsistently, taken the unsuccessful position that taxi drivers who are *owners* of their cabs and operate under a leased logo, radio, etc., are employees. *See Air Transit, Inc. v. NLRB, supra.*

In any event, the plurality does not show that the "permanence" under these leases is any greater than in other taxicab cases where lessees were found to be independent contractors.

Finally, the plurality contradicts its own claim of permanence by attempting to make much of the fact that some leases are not renewed and all are subject to the hazard of nonrenewal. The ALJ made no finding that any lease renewal was refused for reasons other than violation of law, driver dishonesty or fraud, sleeping at cab stands, use of drugs or alcohol or other actions to the mutual detriment of lessor and lessees. ALJ Decision, *supra* note 1, at 28–29 (JA 41–42). Would the Board contend that such drivers should *not* be terminated? In one year, only 21 of 340 drivers [34] were refused renewals, and the majority of those refusals occurred during the driver's probationary period. *See* Tr. 448, 460–61, 463–64 (JA 185–86).

### D. *Summary*

The foregoing demonstrates that each of the factors relied on by the plurality to support its finding of pervasive control has no support in the record or has been held by courts of appeals, or the Board itself, to be insufficient, alone or in combination with other factors, to establish an employer-employee relationship. Moreover, in the last analysis, the two-man plurality sums up the basis for its decision by relying on four of the five *Orlando* factors. 262 NLRB No. 89, at 9 (JA 66). In place of the fifth *Orlando* factor (dress code), the plurality adverts to the flat-rate fares drivers must charge on commercial contracts. *Id.* Such requirements imposed by commercial contracts are not inconsistent with an independent contractor status. *Air Transit, Inc. v. NLRB, supra,* 679 F.2d at 1100 (quoting *SIDA of Hawaii, Inc. v. NLRB, supra,* 512 F.2d at 359. As pointed out above, *see* page 370 *supra,* the most significant fact is that 95 percent of the business of Suburban's drivers is derived from municipally set meter rates. The freedom to conduct 95 percent of one's business independently dwarfs the significance of whatever control might inhere in the commercial contracts.

The Board, in short, has failed to overcome the "strong inference" that no employer-employee relationship exists under this kind of leasing arrangement. *Seafarers, supra,* 603 F.2d at 879. Therefore, the decision of the Board must be reversed.[35] In this respect, we note that our conclusion accords with those of the Internal Revenue Service and the Office of Equal Employment Opportunity, both of whom have ruled that Suburban's drivers are independent contractors, not employees.[36] Accordingly, the decision of the Board is contrary to law and enforcement of the Board's order is denied.

### IV. THE BOARD'S CONDUCT

Petitioner alleges that the Board wilfully disregards or "disagrees" with judicial decisions on taxicab lessees in a manner so pervasive as to be "intolerable if the rule of

**34.** The ALJ reported the total number of lessee drivers to be 240, ALJ Decision, *supra* note 1, at 29 (JA 42), but this appears to be erroneous. *See* Tr. 448. The Board repeats this apparent error. 262 NLRB No. 89, at 9 (JA 66).

**35.** It bears noting that, shortly after the Board issued its Supplemental Decision and Order, two courts of appeals reached the same conclusion we reach today regarding lessee taxi drivers. *See NLRB v. Associated Diamond Cabs, Inc.,* 702 F.2d 912 (11th Cir.1983); *Air Transit, Inc. v. NLRB,* 679 F.2d 1095 (4th Cir.1982). The facts in both cases were closely comparable to those in *Suburban,* and both courts relied heavily on our *Seafarers* decision in rejecting the Board's finding that the lessee drivers were employees. Our attention has also been called to *Murphy Bros., Inc. v. NLRB,* No. 82–2151, (4th Cir. June 27, 1983) (mem.), in which the Fourth Circuit applied the *Air Transit* decision in denying enforcement to a Board order where the Board acknowledged that the facts were similar to those in *Air Transit. Murphy Bros., supra,* at ——.

**36.** *See* Letter from Richard L. Crain, Chief, Wage, Excise and Administrative Provisions Branch, IRS, at 3 (Aug. 5, 1977) (appended to Brief for Petitioner, add. 15, 17); Letter from Haywood L. Perry, District Director, EEOC (Dec. 29, 1978) (appended to Brief for Petitioner, add. 18).

law is to prevail." [37]   Brief for Petitioner at 44 (quoting *Ithaca College v. NLRB,* 623 F.2d 224, 228 (2d Cir.1980)).   Petitioner suggests that we rein in the agency by asserting power under the Contempt Statute, 18 U.S.C. § 401, add. 3a;  the All Writs Act, *id.* § 1651, add. 4;  or by requiring the Board to promulgate prospective rules under the Administrative Procedure Act, 5 U.S.C. § 706, add. 3.

The panel's conduct in the present case (Panello dissenting) does exhibit thinly veiled defiance of the precedent established by our decision in *Seafarers* on the application of common law to the facts.   Having initially agreed with the ALJ that the facts of *Seafarers* and *Suburban* are "not materially distinguishable," the majority of the panel nonetheless held the drivers to be employees.   Only when *Orlando* seemed to suggest a way to circumvent *Seafarers,* through a specious application of the *Orlando* distinctions, did a plurality of the Board reassess its agreement with the ALJ's factual finding.   Having now jettisoned the Board plurality's newly discovered factual distinctions, we are left to face the Board's effective refusal to apply the controlling precedent of this court to the facts at hand.

Such conduct by some members of the Board, as petitioner points out, is hardly new.   Some members of the Board have historically arrogated to themselves the authority to "disagree" with judicial precedent.   In this regard, we express agreement with the following statement by Judge Aldisert:

> This petition for review of an order of the National Labor Relations Board requires us to review the actions of an agency that declines to follow our precedent while conceding applicability of that

precedent.   We hold that the NLRB must respect the applicable decisions of this court, and therefore we grant the petition for review and deny the Board's cross-petition for enforcement.

\*     \*     \*     \*     \*     \*

[T]he Board is not a court nor is it equal to this court in matters of statutory interpretation.   Thus, a disagreement by the NLRB with a decision of this court is simply an academic exercise that possesses no authoritative effect.   It is in the court of appeals and not in an administrative agency that Congress has vested the power and authority to enforce orders of the NLRB.   29 U.S.C. § 160(e).   It is in this court that Congress has vested the power to modify or set aside an order of the NLRB.   29 U.S.C. § 160(f).   In 1803, Chief Justice John Marshall, speaking for a unanimous Court, concisely stated the fundamental principle on which we rely:  "It is emphatically the province and duty of the judicial department to say what the law is.   Those who apply the rule to particular cases, must of necessity expound and interpret that rule.   If two laws conflict with each other, the courts must decide on the operation of each."  *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).   Thus, it is in this court by virtue of its responsibility as the statutory court of review of NLRB orders that Congress has vested a superior power for the interpretation of the congressional mandate.   Congress has not given to the NLRB the power or authority to disagree, respectfully or otherwise, with decisions of this court.   See *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).   For the Board to

---

**37.** In the past 10 years, the Board has been overruled in 12 independent contractor cases. *Diamond Cabs, supra; Air Transit, Inc. v. NLRB, supra; NLRB v. Tri-State Transp. Corp.,* 649 F.2d 993 (4th Cir.1981); *NLRB v. A. Duie Pyle, Inc.,* 606 F.2d 379 (3d Cir.1979); *Seafarers, supra; Merchants Home Delivery Service, Inc. v. NLRB,* 580 F.2d 966 (9th Cir.1978); *Associated General Contractors of California, Inc. v. NLRB,* 564 F.2d 271 (9th Cir.1977); *Lorenz Schneider Co. v. NLRB,* 517 F.2d 445 (2d Cir.

1975); *SIDA of Hawaii, Inc. v. NLRB, supra; Carnation Co. v. NLRB,* 429 F.2d 1130 (9th Cir.1970); *Meyer Dairy, Inc. v. NLRB,* 429 F.2d 697 (10th Cir.1970); *Murphy Bros., Inc. v. NLRB,* No. 82–2151, (4th Cir. June 27, 1983) (mem.).   Five of these involved lessee cab drivers.   The Board exceeds its authority when it refuses to apply the controlling law to cases that are not materially distinguishable.

predicate an order on its disagreement with this court's interpretation of a statute is for it to operate outside the law. Such an order will not be enforced.

*Allegheny General Hospital v. NLRB,* 608 F.2d 965, 968, 970 (3d Cir.1979). At least four other courts of appeals have also criticized the Board for its practices.[38]

■ At this time we decline to take the stern measures urged upon us by petitioner. We acknowledge that these employment status questions pose difficult problems whose resolution is necessarily *ad hoc* and may turn on nice factual distinctions. But these are matters which require the application of the common law rules of agency, and we are thus as competent as the Board to pass upon them. *Id.* at 970. We admonish the Board to halt its apparently *willful* defiance of long established, controlling judicial precedent in independent contractor cases involving lessee cab drivers. Should the Board continue to act in defiance of well established decisional law of this and other courts, we may be required to secure adherence to the rule of law by measures more direct than refusing to enforce its orders. We acknowledge that the Board is not required to conform its rulings to every decision by a court of appeals and that no absolute rule can be applied to every case. But when the law has been firmly established, as is the applicable law here, the Board in our opinion is required to give those courts greater deference than the Board did in this case.[39]

---

38. *NLRB v. HMO Int'l,* 678 F.2d 806, 812 (9th Cir.1982); *Ithaca College v. NLRB, supra,* 623 F.2d at 228; *Mary Thompson Hospital, Inc. v. NLRB,* 621 F.2d 858, 862–64 (7th Cir.1980); *NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d 666, 671–72 (1st Cir.1979).

39. In his concurring opinion, Judge Wright takes issue with the above criticisms of the Board for its failure to follow settled law on independent contractor status as established by *Seafarers* and many other applicable federal decisions. *See* note 37 *supra.* The most recent of these decisions have applied section 2(3) of the Act, which Congress added in 1947 explicitly to exempt "independent contractors" from being treated as "employees" under the Act. 29 U.S.C. § 152(3) (1976); *see Seafarers, supra,* 603 F.2d at 904–07. Relying on dicta in *S. & H. Riggers & Erectors v. OSHRC,* 659 F.2d 1273, 1278–79 (5th Cir.1981), Judge Wright argues that the Board is free to decline to follow decisions of the courts of appeals with which it disagrees. This may be true to a certain degree but not to the gross extent that the majority of the Board attempts here.

The situations in *Riggers* and this case differ in critical respects. In *Riggers,* the Occupational Safety and Health Review Commission (OSHRC or the Commission) was administering a recently enacted statute, Pub.L. No. 91–596, 84 Stat. 1590 (1970), *codified at* 29 U.S.C. § 651 *et seq.* (1976), the construction of which has *not* become settled. Administrative interpretations are entitled to great deference where a court must review a contemporaneous construction of a statute by those charged with setting its machinery in motion. *See Norwegian Nitrogen Prods. v. United States,* 288 U.S. 294, 319, 53 S.Ct. 350, 359–360, 77 L.Ed. 796 (1933). Furthermore, the Commission in *Rig-*

*gers* was acting within its area of special expertise. *See* 659 F.2d at 1278.

In contrast, the Board here is acting in an area where it is called upon to apply common law principles that have been established since 1800 and where the application of that law under the National Labor Relations Act has been declared by Congress and settled by the courts, including the Supreme Court, for some 36 years. In this area, there is no dispute as to the governing principles of law; what is involved is the application of law to facts. "[S]uch a determination of pure agency law involve[s] no special administrative expertise that a court does not possess." *NLRB v. United Ins. Co. of America, supra,* 390 U.S. at 260, 88 S.Ct. at 991. Consequently, unlike the Commission in *Riggers,* the Board here is not acting within the area of its special expertise.

Actually, the Board does not profess to disagree with the courts of appeals on basic principles of law. Instead, it is the Board's often disingenuous misapplication of the law to the facts that creates the problem. In its opinion here, *see* 262 NLRB No. 89 (JA 58–67), the plurality overemphasizes and overstates facts it considers to be favorable to its conclusion; underemphasizes, misconstrues, understates, and refuses to acknowledge facts that are not favorable; relies on irrelevant evidence and assertions that are not supported by the record; disdains even entertaining contrary implications where facts may cut both ways; draws illogical and cryptic conclusions; fails to recognize the legal operating requirements of licensed common carriers; and erroneously treats ordinary suggestions, notices and expectations as mandatory instructions and orders. In sum, as we have pointed out above, the plurality most egregiously fails to assess and weigh the "*total* factual context . . . in light of the pertinent common-law agency principles."

### V. CONCLUSION

At practically all times in the conduct of their operations, the physical activities of Suburban's lessee drivers are not controlled by the lessor. Lessees are not required to accept any calls or dispatches, to report their location during the lease period, to station the cab in any designated place, to buy gasoline from the company, or generally to operate their business in any prescribed manner. They are concededly on their own once they leave the garage and are free to prospect for fares when and where they choose. Drivers agree to pay only a daily rate for the lease of the cab, to use care and skill in driving it, and to comply with applicable laws and governmental regulations. The lease of the cab to the driver places the car in his exclusive control. Suburban pays no money to its lessee drivers. Finally, respect is owed the lease arrangement, voluntarily entered into between the parties, by which they expressly recite their intent to create an independent contractor relationship. *See Seafarers, supra,* 603 F.2d at 897–98.

For the reasons heretofore stated, Suburban's petition for review is granted and the Board's cross-petition for enforcement of its order is denied.

*Order accordingly.*

---

NLRB v. United Ins. Co. of America, supra, 390 U.S. at 258, 88 S.Ct. at 991 (emphasis added).
In fact, many of the Board's rulings on the independent contractor status of cab drivers appear to indicate the recrudescence of its position prior to the amendment of section 2(3) in 1947. That prior position was characterized by Justice Black, writing for a unanimous Court in *United Insurance,* as the application of a standard "of economic and policy considerations within the labor field." *Id.* at 256, 88 S.Ct. at 989. The Court observed that, in amending section 2(3) in 1947, Congress declared its "adverse" reaction to that construction of the Act. *Id.* This discredited construction is what Member Zimmerman refers to as "our implicit congressional mandate." 262 NLRB No. 89, at 11 (JA 68) (Zimmerman, concurring). But this case is governed by the *express* mandate of Congress in section 2(3).
The foregoing fully distinguishes *Riggers* and the analogy to the deference due OSHRC deci-

---

J. SKELLY WRIGHT, Circuit Judge, concurring:

I concur in all of the court's opinion except for Part IV. I cannot concur with the condemnation of Board behavior contained in that Part. Although a number of circuit courts have voiced similar condemnations of the Board's practice of adhering to positions even after numerous circuit courts have refused enforcement, *see, e.g., Allegheny General Hospital v. NLRB,* 608 F.2d 965, 968–970 (3d Cir.1979); *Ithaca College v. NLRB,* 623 F.2d 224, 227–230 (2d Cir.1980), I believe the better position was that taken by the Fifth Circuit when confronted with analogous behavior in *S & H Riggers & Erectors, Inc. v. OSHRC,* 659 F.2d 1273, 1278–1279 (5th Cir.1981). There the agency "respectfully decline[d] to follow" controlling precedent, arguing "that an administrative agency charged with the duty of formulating uniform and orderly national policy in adjudications is not bound to acquiesce in the views of the U.S. courts of appeals that conflict with those of the agency." Chief Judge Godbold's opinion "assume[d] without deciding that the Commission is free to decline to follow decisions of the courts of appeals with which it disagrees, even in cases arising in those circuits" (footnote omitted), but pointed out that a circuit court panel did "not have that freedom but must follow the precedent set by prior panels * * * until and unless they

---

sions. No more availing are Judge Wright's references to two recent Supreme Court decisions, *Charles D. Bonnano Linen Service, Inc. v. NLRB,* 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982); *NLRB v. Enterprise Ass'n of Steam Pipefitters,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). *Cf. Enterprise Ass'n of Steam Pipefitters v. NLRB,* 521 F.2d 885, 914–41 (D.C.Cir.1975) (MacKinnon, J., dissenting), *rev'd* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977). These cases stand only for the unassailable proposition that unsound decisions are always capable of being reversed. While no categorical rule can be laid down respecting the deference due every prior judicial decision, the "implicit congressional mandate" the Board appears to invoke here must give way to the common law of agency. No court can overlook an agency's defiant refusal to follow well established law.

are reversed by the court en banc or by the Supreme Court." To go beyond Chief Judge Godbold's view may be unwise, particularly in light of the instances in which positions taken by the Board were first repeatedly rejected by a large number of circuits, then accepted by others, and later accepted by the Supreme Court. *See, e.g., Charles D. Bonnano Linen Service, Inc. v. NLRB,* 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (Court upheld Board's position that had initially been rejected by five circuits and then accepted by two, including one which had previously rejected it); *NLRB v. Enterprise Ass'n of Steam Pipefitters,* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977) (Court upheld Board's position that had initially been rejected by five circuits and then accepted by two).

BORK, Circuit Judge, concurring:

I concur in Judge MacKinnon's incisive and thorough opinion in almost all respects. Since decision of this case does not require it, however, I have not studied the Board's past conduct in the detail necessary either to agree or disagree with his strong criticism of the Board. That is not to say that I do not think some criticism warranted. An agency with nationwide jurisdiction is not required to conform to every interpretation given a statute by a court of appeals. In this case, however, the Board appears less to have been seeking reconsideration of a legal issue than trying to achieve a desired result by a somewhat disingenuous treatment of the facts.